UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION

| | |
|---|---|
| IN RE: STERICYCLE, INC., STERI-SAFE CONTRACT LITIGATION | No. 13 C 5795<br>MDL No. 2455<br><br>Judge Milton I. Shadur<br><br>**CLASS ACTION**<br><br>**JURY TRIAL DEMANDED** |

<u>**PLAINTIFFS' SECOND AMENDED CONSOLIDATED COMPLAINT**</u>

**[REDACTED VERSION]**

# TABLE OF CONTENTS

**Page**

I.      NATURE OF ACTION ................................................................................ 1

II.     JURISDICTION AND VENUE .............................................................. 4

III.    PARTIES ................................................................................................. 5

IV.    GENERAL ALLEGATIONS ................................................................. 9

       A.      Stericycle and the Regulated Waste Disposal Business ........................ 9

       B.      Stericycle's Standard Form "Steri-Safe Service Agreement" ............. 11

       C.      Stericycle's Unlawful, Unilateral "Automated Price Increase"
              Policy ............................................................................................... 15

       D.      Stericycle's Misleading and Coercive "Customer Retention"
              Efforts ............................................................................................. 22

       E.      Stericycle Knew Its API Policy Was Wrongful, But Chose to
              Continue Them
              In Order to Protect Its Revenue ...................................................... 24

       F.      The *Qui Tam* Suit ............................................................................ 25

       G.      Plaintiffs' Experience With Stericycle's Automated Price Increases ................. 28

              1.      Lyndon Veterinary Clinic. ................................................... 28

              2.      Cochranton Veterinary Hospital. .......................................... 29

              3.      ResearchDx. ......................................................................... 31

              4.      Amores Dental Care. ............................................................ 32

              5.      Drs. McMackin & Zimnoch, P.C. ........................................ 32

              6.      Madison Avenue Professional Building. ............................... 33

              7.      Greater Hampstead Family Medicine. ................................... 33

       H.      Stericycle's Practice of Charging Steri-Safe Customers Automated
              Price
              Increases Has Caused Damage to Plaintiffs and the Class ............... 34

V.     CLASS ACTION ALLEGATIONS ...................................................... 35

010362-11 849533 V1

VI.     CHOICE OF LAW ........................................................................................ 40

VII.    TOLLING OF STATUTES OF LIMITATION ............................................. 41

VIII.   CAUSES OF ACTION ................................................................................ 41

COUNT I  BREACH OF CONTRACT AND BREACH OF THE  COVENANT
        OF GOOD FAITH AND FAIR DEALING (ILLINOIS LAW) ..................................... 41

COUNT II  VIOLATIONS OF THE ILLINOIS CONSUMER FRAUD AND
        DECEPTIVE BUSINESS PRACTICES ACT, 815 ILCS § 505/1, *et seq.*,
        AND ILLINOIS
        UNIFORM DECEPTIVE TRADE PRACTICES ACT, 815 ILCS § 510/2 .................. 44

COUNT III  VIOLATIONS OF THE ARIZONA CONSUMER FRAUD ACT
        (ARIZ. REV. STAT. § 44-1521 *et seq.*) ............................................................ 47

COUNT IV  VIOLATIONS OF THE ARKANSAS DECEPTIVE TRADE
        PRACTICES ACT (ARK. CODE ANN. § 4-88-101 *et seq.*) ............................... 48

COUNT V  VIOLATIONS OF THE CALIFORNIA UNFAIR COMPETITION
        LAW
        (CAL. BUS. & PROF. CODE § 17200, *et seq.*) ................................................ 50

COUNT VI  VIOLATION OF CALIFORNIA FALSE ADVERTISING LAW
        (CAL. BUS.
        & PROF. CODE §§ 17500, *et seq.*) ............................................................... 51

COUNT VII  VIOLATIONS OF THE COLORADO CONSUMER
        PROTECTION ACT (COLO. REV. STAT. § 6-1-101, *et seq.*) ......................... 53

COUNT VIII  VIOLATIONS OF THE CONNECTICUT UNFAIR TRADE
        PRACTICES
        ACT (CONN. GEN. STAT. ANN. § 42-110A, *et seq.*) ..................................... 54

COUNT IX  VIOLATIONS OF THE DELAWARE CONSUMER FRAUD ACT
        (6 DEL.
        CODE § 2513, *et seq.*) ................................................................................... 56

COUNT X  VIOLATIONS OF THE DELAWARE DECEPTIVE TRADE
        PRACTICES
        ACT (6 DEL. CODE § 2532, *et seq.*) ............................................................ 57

COUNT XI  VIOLATIONS OF THE FLORIDA DECEPTIVE AND  UNFAIR
        TRADE PRACTICES ACT (FLA. STAT. § 501.201, *et seq.*) ......................... 58

COUNT XII  VIOLATIONS OF THE IDAHO CONSUMER PROTECTION
ACT
(IDAHO CIV. CODE § 480, *et seq.*) ................................................... 59

COUNT XIII  VIOLATIONS OF THE MASSACHUSETTS CONSUMER
PROTECTION ACT (MASS. GEN. LAWS CH. 93A, *et seq.*)............................................ 60

COUNT XIV  VIOLATIONS OF THE MINNESOTA PREVENTION OF
CONSUMER FRAUD ACT (MINN. STAT. § 325F.68-70) ............................................ 61

COUNT XV  VIOLATIONS OF THE NEBRASKA CONSUMER
PROTECTION ACT
(NEB. REV. STAT. § 87-301, *et seq.*) ............................................ 62

COUNT XVI  VIOLATIONS OF THE NEW HAMPSHIRE CONSUMER
PROTECTION ACT (N.H. REV. STAT. § 358-A:1, *et seq.*) ........................................... 64

COUNT XVII  VIOLATIONS OF THE NEW JERSEY CONSUMER FRAUD
ACT
(N.J. STAT. ANN. § 56-8-19, *et seq.*) ............................................ 65

COUNT XVIII  VIOLATIONS OF THE NEW MEXICO UNFAIR TRADE
PRACTICES
ACT (N.M. STAT. ANN. § 57-12-1, *et seq.*)..................................................... 67

COUNT XIX  VIOLATIONS OF THE NEW YORK GENERAL BUSINESS
LAW (N.Y.
GEN. BUS. LAW § 349)...................................................................... 69

COUNT XX  VIOLATIONS OF THE NORTH CAROLINA UNFAIR AND
DECEPTIVE TRADE PRACTICES ACT (N.C. GEN. STAT. § 75-1.1, *et
seq.*).......................................................................................... 70

COUNT XXI  VIOLATIONS OF THE NORTH DAKOTA CONSUMER
FRAUD ACT
(N.D. CENT. CODE § 51-15-01, *et seq.*) .......................................... 71

COUNT XXII  VIOLATIONS OF THE OKLAHOMA CONSUMER
PROTECTION ACT (OKLA. STAT. TIT. 15 § 751, *et seq.*)............................................ 73

COUNT XXIII  VIOLATIONS OF THE OKLAHOMA CONSUMER
DECEPTIVE
TRADE PRACTICES ACT (OKLA. STAT. TIT. 78 § 51-55, *et seq.*) ............................. 75

COUNT XXIV  VIOLATIONS OF THE SOUTH CAROLINA UNFAIR
TRADE
PRACTICES ACT (S.C. CODE ANN. § 39-5-10, *et seq.*) ................................ 76

COUNT XXV  VIOLATIONS OF THE SOUTH DAKOTA DECEPTIVE
  TRADE PRACTICES AND CONSUMER PROTECTION ACT (S.D.
  CODE ANN. § 39-5-10,
  *et seq.*) ................................................................................................... 78

COUNT XXVI  VIOLATIONS OF THE TENNESSEE CONSUMER
  PROTECTION
  ACT (TENN. CODE ANN. § 47-18-101, *et seq.*)................................................ 79

COUNT XXVII  VIOLATIONS OF THE TEXAS DECEPTIVE TRADE
  PRACTICES
  ACT (TEX. BUS. & COM. CODE § 17.41, *et seq.*) ........................................... 80

COUNT XXVIII  VIOLATIONS OF THE VERMONT CONSUMER FRAUD
  ACT (VT.
  STAT. ANN. § 2451, *et seq.*) ........................................................................ 81

PRAYER FOR RELIEF ....................................................................................... 82

DEMAND FOR JURY TRIAL ............................................................................. 84

Plaintiffs Lyndon Veterinary Clinic, PLLC, ResearchDx, LLC, d/b/a Pacific Diagnostics Clinical Laboratory, Cochranton Veterinary Hospital, Amores Dental Care, Drs. McMackin & Zimnoch, P.C., Madison Avenue Professional Building, and Greater Hampstead Family Medicine, PC ("Plaintiffs"), individually and on behalf of a class of all those similarly situated, upon personal knowledge as to facts pertaining to each individual plaintiff and upon information and belief as to all other matters, based on the investigation of its counsel, against Defendant STERICYCLE, INC. ("Stericycle" or "Defendant"), states as follows:

## I.    NATURE OF ACTION

1.    Plaintiffs have brought this lawsuit to combat Stericycle's widespread pattern of fraudulent, misleading and wrongful conduct. That conduct and the legal claims arising from it are detailed below. But all of Plaintiffs' allegations and claims rest upon two fundamental rules. The first rule: a deal is a deal. Stericycle entered into fixed-price contracts and it was obligated to honor those prices. The second rule: tell the truth. Stericycle was obligated to give its customers accurate and complete information about its service contracts and the prices it charged.

2.    Plaintiffs have brought this action because Stericycle didn't follow those fundamental rules. To Stericycle, the deal was not the deal. Stericycle did not honor the fixed prices it promised to charge its customers. Instead, Stericycle systematically and regularly raised its prices, without any justification and without even notifying them it was doing so. Nor did Stericycle honor its obligation to tell the truth. Instead, Stericycle misled customers about its pricing and practices and induced them to become or remain customers by falsely representing that its rates were fixed, failing to disclose its practice of increasing prices, failing to even notify customers that prices had changed, and then lying about the reasons for price increases when

challenged. Stericycle's practices were not fair, they were not right, and as detailed below, they were against the law.

3.     Stericycle is a large, a publicly traded medical waste disposal company. It provides medical waste collection and disposal services for medical clinics, veterinary clinics, medical labs, municipal jails, and other businesses that generate regulated medical waste across the country. Stericycle's business generates substantial revenues – in 2012, it posted $1.9 billion in revenue – and it has shown substantial revenue growth for many years running. But Stericycle did not generate all of this revenue or revenue growth honestly. In fact, Stericycle generated this extraordinary revenue and achieved its steady revenue growth by programming its internal billing and accounting software to charge an 18% price increase in the flat rates it agreed to charge its customers, which its billing software has imposed automatically every 6 to 12 months since at least 2003. This "automated price increase," or "API," to use Stericycle executives' corporate-speak, has never been disclosed to the customers who paid it, and it is not permitted by the customers' contracts with Stericycle.

4.     Stericycle used an internal electronic billing and accounting software system called Tower, later replaced by a similar system known as "Steri-Works." Stericycle executives directed that the Tower / Steri-Works programming default to an 18% "automated price increase" for "small-quantity," non-institutional customers, which in 2012, made up 97% of Stericycle's 541,000 customers worldwide. Stericycle imposed the API without notice or explanation every six to twelve months. The frequency varied over time depending on Stericycle's need to generate revenue and meet Wall Street expectations, but the practice did not. Stericycle has consistently employed API as a revenue generating tool since at least 2003. As a

result, the supposedly "fixed rates" these customers were supposed to pay frequently doubled or more during the typical three to five year contract term.

5.      Stericycle's executives knew the automated price increases were wrong, because in 2006 they were urged by their own Vice President to reprogram the Tower system in order to cease the practice with respect to federal governmental customers when several federal customers got wind of it.  But they continued the practice with regard to the vast majority of their SQ customers.  On information and belief, Stericycle  continued its practice after it settled a *qui tam* case under the False Claims Act with the New York State Attorney General in 2012.  That case involved the same API policies at issue here,  but the settlement was ***for New York governmental customers only***.

6.      Stericycle executives continued the practice after recognizing seven years ago that it was wrong because of the tremendous revenue generated from automated price increases.  As an internal Stericycle e-mail states, "projected PI [Price Increase] revenue" was so big that it was separately tracked in "PI Impact analysis reports … sen[t] to Mark/Frank/Rich each month" – referring to Stericycle's three highest executives, CEO Mark Miller, CFO Frank Ten Brink, and COO Rich Kogler.  The revenue stream from automated price increases was so great that Stericycle only modified its practice for government customers when forced to by a multi-state government investigation.  It continued its API practice for SQ customers, who did not have the power of state and federal governments backing them up.

7.      Stericycle's automated price increases were imposed automatically by the company's electronic billing software on the vast majority of Stericycle's "small-quantity" medical waste disposal customers.  The legality of this common course of conduct will be adjudicated based on a common nucleus of operative facts from information in Defendant's

control. The only material difference among prospective class members' claims is the specific amount of their damages. The operative customer contracts, standard form agreements written by Stericycle with no input from its customers, contained a choice-of-law clause applying a single state's laws to all disputes. Adjudicating individually each claim of the hundreds of thousands of class members would overwhelm the court system. This case is well-suited for treatment as a class action.

8.     On behalf of themselves and all others similarly situated, Plaintiffs seek relief from Stericycle for injuries caused by this common practice, including: (a) an order certifying the action to be maintained as a Class action and ordering Plaintiffs and lead counsel to represent the Class; (b) restitution; (c) compensatory damages; (d) punitive, statutory, and/or treble damages; (e) attorneys' fees; (f) costs of this suit; (g) pre- and post-judgment interest; and (h) such other and further relief as this Court may deem necessary or proper.

## II.     JURISDICTION AND VENUE

9.     This Court has subject matter jurisdiction over this class action pursuant to 28 U.S.C. § 1332 as amended by the Class Action Fairness Act of 2005 because the matter in controversy exceeds $5,000,000, exclusive of interest and costs, because the proposed Class consists of 100 or more members, and minimal diversity exists.

10.     This Court has personal jurisdiction over Defendant because Stericycle is authorized to do business and in fact does business in this district and has sufficient minimum contacts with this district, and/or otherwise intentionally avails itself of the markets in this state through the promotion, marketing and sale of its services in this district, to render the exercise of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice.

11.     Pursuant to 28 U.S.C. § 1391, venue is proper in the Northern District of Illinois because Defendant resides in this District, Defendant is found in this District, and/or Defendant

- 4 -

is subject to personal jurisdiction in this District. Venue is also proper because the Judicial Panel on Multidistrict Litigation transferred the cases constituting this MDL to this district. Further, as discussed below, Stericycle was a Defendant in a *qui tam* action pending in this Court that settled since the initiation of this lawsuit.

### III.    PARTIES

12.    Plaintiff LYNDON VETERINARY CLINIC, PLLC is a New York professional limited liability company with its principal place of business in Fayetteville, New York. In or about December 2008, Lyndon Veterinary Clinic entered into a Steri-Safe Service Agreement, under which Stericycle was to provide medical waste disposal services for a fixed fee. Lyndon Veterinary Clinic's agreement with Stericycle did not permit or provide for Stericycle to impose automated price increases for the services Stericycle performed. Moreover, Stericycle never disclosed to Lyndon Veterinary Clinic that the agreed fee would be raised during the term of the contract by automated price increases imposed without notice or explanation. Despite this fact and in violation of its contract, Stericycle charged Lyndon Veterinary Clinic automated price increases of 21.1% in 2009, 17.8% in 2010, and 25.4% in 2012. As a result, Lyndon Veterinary Clinic has been damaged.

13.    Plaintiff RESEARCHDX, LLC is a California Limited Liability Company with its principal place of business in Irvine, California, doing business as Pacific Diagnostics Clinical Laboratory. In or about October 2010, ResearchDx entered into a Steri-Safe Service Agreement, under which Stericycle was to provide medical waste disposal services for a fixed fee. ResearchDx's agreement with Stericycle did not permit or provide for Stericycle to impose automated price increases for the services Stericycle performed. Moreover, Stericycle never disclosed to ResearchDx that the agreed fee would be raised during the term of the contract by automated price increases without notice or explanation. Despite this fact and in violation of its

contract, Stericycle imposed automated price increases that nearly doubled the price it charged ResearchDx between October 2010 and August 2013. As a result, ResearchDx has been damaged.

14.     Plaintiff COCHRANTON VETERINARY HOSPITAL is a Pennsylvania corporation with its principal place of business in Cochranton, Pennsylvania. In or about October 2009, Cochranton Veterinary Hospital entered into a Steri-Safe Service Agreement, under which Stericycle was to provide medical waste disposal services for a fixed fee. Cochranton Veterinary Hospital's agreement with Stericycle did not permit or provide for Stericycle to impose automated price increases for the services Stericycle performed. Moreover, Stericycle never disclosed to Cochranton Veterinary Hospital that the agreed fee would be raised during the term of the contract by automated price increases without notice or explanation. Despite this fact and in violation of its contract, Stericycle imposed automated price increases of 18% on Cochranton Veterinary Hospital between January 2010 and March 2013, for an aggregate price increase of 79% over a period of 26 months. As a result, Cochranton Veterinary Clinic has been damaged.

15.     Plaintiff AMORES DENTAL CARE ("Amores") is a dental practice in Miami, Florida. In or about June of 2010, it entered into a Steri-Safe Service Agreement, under which Stericycle was to provide medical waste disposal services for a fixed fee of approximately $291 per month. Amores's agreement with Stericycle did not permit or provide for Stericycle to impose automated price increases for the services Stericycle performed. Moreover, Stericycle never disclosed to Amores that the agreed fee would be raised during the term of the contract by automated price increases without notice or explanation. Despite this fact and in violation of its

- 6 -

contract, Stericycle imposed automated price increases that resulted in the initial monthly fee increasing to approximately $634 in 2013. As a result, Amores has been damaged.

16. Plaintiff DRS. MCMACKIN & ZIMNOCH, P.C. ("M&Z") is a medical practice in Washington, D.C. In or about May of 2010, it entered into a Steri-Safe Service Agreement, under which Stericycle was to provide medical waste disposal services for a fixed fee. M&Z's agreement with Stericycle did not permit or provide for Stericycle to impose automated price increases for the services Stericycle performed. Moreover, Stericycle never disclosed to M&Z that the agreed fee would be raised during the term of the contract by automated price increases without notice or explanation. Despite this fact and in violation of its contract, Stericycle imposed automated price increases that resulted in the initial monthly fee nearly doubling between the beginning of the contract term and around April of 2013, when it was increased to $691.40. As a result, M&Z has been damaged.

17. Plaintiff MADISON AVENUE PROFESSIONAL BUILDING ("Madison") is a plastic surgery practice in Torrance, California. In or about October 2009, it entered into a Steri-Safe Service Agreement, under which Stericycle was to provide medical waste disposal services for a fixed fee. Madison's agreement with Stericycle did not permit or provide for Stericycle to impose automated price increases for the services Stericycle performed. Moreover, Stericycle never disclosed to Madison that the agreed fee would be raised during the term of the contract by automated price increases without notice or explanation. Between July of 2011 and March of 2013, Stericycle imposed four separate 18% automatic price increases. Madison was also charged a California AB fee beginning in February of 2011, and an Environmental/Regulatory fee beginning in October of 2011. As a result, Madison has been damaged.

18.     Plaintiff GREATER HAMPSTEAD FAMILY MEDICINE, PC ("Greater Hampstead") is a medical practice in Hampstead, New Hampshire.  Greater Hampstead has been a Stericycle customer since at least 2003.  During that time, Stericycle consistently and repeatedly raised the rates it charged Greater Hampstead, in violation of the terms of the agreement between the parties.  Greater Hampstead's experience since May 2010 is demonstrative.  In May 2010, Greater Hampstead entered into a Steri-Safe Service Agreement, under which Stericycle was to provide medical waste disposal services for a fixed fee of $50.00 per month.  Greater Hampstead's agreement with Stericycle did not permit or provide for Stericycle to impose automated price increases for the services Stericycle performed.  Moreover, Stericycle never disclosed to Hampstead Family Medicine that the agreed fee would be raised automatically during the term of the contract by automated price increases without notice or explanation.  However, between May 2010 and November 2013, Stericycle increased the prices it charged to Greater Hampstead at least nine times.  Stericyle's November 2013 invoice to Greater Hampstead was for $122.14, well over twice the amount to which the parties had agreed in May 2010.  On information and belief, the increase in the price Stericycle charged bore no relation to any operational changes brought about by changes in the law or other increased costs that could justify a price increase under the Service Agreement.  As a result, Greater Hampstead Family Medicine has been damaged.

19.     Defendant STERICYCLE, INC. is a Delaware corporation with its principal corporate offices located at 28161 North Keith Drive in Lake Forest, Illinois, 60045.  Defendant has been and still is engaged in the business of providing medical waste disposal services in the United States and abroad.

- 8 -

## IV.    GENERAL ALLEGATIONS

### A.    Stericycle and the Regulated Waste Disposal Business

20.    After medical waste washed up on several East Coast beaches in 1987, concern over potential health hazards prompted Congress to enact the Medical Waste Tracking Act ("MWTA") of 1988.  Among other things, the MWTA enacted requirements related to the disposal of medical waste.  The medical waste industry was an outgrowth of the MWTA.

21.    Stericycle has been in the regulated medical waste business since 1989. Regulated medical waste is generally any medical waste that can cause an infectious disease and includes single-use disposable items such as needles, syringes, gloves, and other medical supplies; cultures and stocks of infectious agents; blood and blood products; and regulated pharmaceutical waste, which consists of expired or recalled pharmaceuticals.

22.    The regulated medical waste services Stericycle provides include its pickup and disposal services provided to the majority of its customers (called the "Steri-Safe" program), medical waste disposal, a clinical services program, reusable sharps disposal management services, pharmaceutical waste disposal, and hazardous waste disposal.

23.    Stericycle serves approximately 541,000 customers worldwide.  It divides its customers into two categories, large-quantity and small-quantity waste generators.  According to its website, Stericycle "maintains the nation's largest network of medical waste transport vehicles, collection sites, and treatment facilities."[1]  Large-quantity waste generators include hospitals, blood banks, and pharmaceutical manufacturers.  Small-quantity waste generators are such businesses as outpatient medical clinics, medical and dental offices, long-term and sub-acute care facilities, veterinary offices, and retail pharmacies.  Stericycle's small-quantity waste

---

[1] *See* http://www.stericycle.com/bio-hazard-waste/red-bag (last visited Nov. 12, 2013).

generating customers also include federal and state government agencies, municipalities, prisons, and jails. Stericycle services both private and governmental entities.

24.     Almost all of Stericycle's customers are small-quantity customers, which include outpatient clinics, medical and dental offices, long-term and sub-acute care facilities, veterinary offices, municipalities and retail pharmacies. Ninety-seven percent (524,500) of Stericycle's 541,000 customers worldwide in 2012 were small-quantity waste generators.

25.     A majority of Stericycle's revenues are generated from small-quantity customers. Stericycle had domestic revenues of $1.37 billion in 2012. Sixty-three percent, or $863 million, were from small-quantity customers. And more of Stericycle's profits come from these customers. As stated in Stericycle's 2012 10-K, Stericycle achieved "higher gross margins … with our small-quantity customers relative to our large-quantity customers."

26.     Defendant targets small-quantity customers as a growth area for its regulated waste business. According to the Defendant's 2011 Annual Report it "believes that when small-quantity regulated waste customers view the potential risks of failing to comply with applicable regulations they value the services that [Stericycle] provide[s]. [Stericycle] consider[s] this factor to be the basis for the higher gross margins that [it has] achieved with [its] small-quantity customers relative to [its] large-quantity customers."

27.     Stericycle has significant customer diversification. No one customer accounts for more than 1.5% of Stericycle's total revenues, and its top ten customers account for approximately 6% of the company's total revenues.

28.     Stericycle uses both telemarketing and direct sales efforts to obtain new small-quantity customers. In addition, Stericycle's waste disposal drivers actively solicit small-

- 10 -

quantity customers. Stericycle targets small-quantity customers as a growth area of its regulated waste business.

29.     Stericycle dominates the domestic market for medical waste disposal services. After going public in 1996, the company went on a buying spree of competitors in the medical waste disposal industry. As described on its website, "[o]ur medical waste business emerged as the industry leader when we acquired 14 other acquisitions, including the medical waste division of BFI – the largest provider of medical waste services at that time."[2]

30.     By 2000, Stericycle was ranked 10th among the United States' fastest growing companies by *Fortune Magazine*.

31.     Stericycle has completed nearly 300 acquisitions since 1993. It continues to aggressively grow today. On a recent earnings call discussing the company's 2012 second quarter earnings, Richard T. Kogler, Stericycle's Chief Operating Officer and Executive Vice President, stated that "we continue to use our strong free cash flow to drive our growth-through acquisitions. In this quarter, we closed 8 transactions, 3 domestic and 5 international." In the first quarter of 2012, Stericycle completed 11 such transactions (6 domestic and 5 international).

32.     One of the consequences of Stericycle's rapid growth and large market share was that its customers (and potential customers) had fewer options for competing waste disposal services. This helped lay the framework for Stericycle's deceptive charging practices described below.

B.      **Stericycle's Standard Form "Steri-Safe Service Agreement"**

33.     When Stericycle acquires a new small-quantity customer, whether from a cold call, client-initiated call, or through acquisition, Stericycle offers the customer its standard form

---

[2] *See* http://www.stericycle.com/history (last visited Nov. 12, 2013).

- 11 -

"Steri-Safe Service Agreement," which is a one to five year fixed-price agreement calling for specified, monthly or quarterly waste pick-ups. A majority of small-quantity customers have the form "Steri-Safe" small-quantity customer contract.

34. Customers for Stericycle's "Steri-Safe" service pay a predetermined, fixed-price subscription fee in advance for regulated waste collection and processing services. This service purports to satisfy the customer's obligations to dispose of medical waste in compliance with regulations of state and federal agencies, such as the Environmental Protection Agency and the Occupational Health and Safety Administration. The standard form Steri-Safe Service Agreement contains an automatic term renewal provision requiring affirmative action by the customer or Stericycle to terminate the Agreement or prevent automatic renewal.

35. The Steri-Safe Service Agreement is a standard form contract of adhesion drafted by Steri-Safe with no input from the customer. The terms and conditions of the Steri-Safe Service Agreement, and other written contracts offered by Stericycle, contain a choice-of-law provision that states that Illinois law governs any disputes between the parties to the contracts.

36. The Steri-Safe Service Agreement consists of a cover sheet listing "Steri-Safe Program Benefits," fees, and a line for the customer's signature and a separate writing titled "Steri-Safe Terms and Conditions." A copy of the Steri-Safe Service Agreement provided by Stericycle to Plaintiff Lyndon Veterinary Clinic is attached as Exhibit 1.

37. As reflected on Exhibit 1, the Terms and Conditions provided by Stericycle to Lyndon Veterinary Clinic were a copy of a facsimile, in reduced type size, and completely illegible. On information and belief, Stericycle's standard practice is to provide new customers Terms and Conditions to the Steri-Safe Service Agreement in similar illegible condition.

- 12 -

38.     In general, the Steri-Safe Terms and Conditions require Stericycle to collect, transport, treat, and dispose of regulated medical waste generated by the customer during the term of the agreement.

39.     The time period of the Steri-Safe Service Agreement is typically 36 to 60 months from the effective date.  However, the Terms and Conditions provide that the Service Agreement automatically renews for successive terms equal to the original term.  To prevent automatic renewal, the customer must give 60 days' written notice of its desire to terminate the agreement, and the notice must be made during the six-month period prior to the renewal date.

40.     The prices the customer must pay for medical waste pickup and disposal are listed on the cover page of the Service Agreement.  Steri-Safe customers typically pay Stericycle a flat monthly or quarterly fee, the amount of which is expressly stated on the Service Agreement cover page.

41.     Stericycle offers a "select" and a "preferred" Steri-Safe service package. Generally, the "select" service involves medical waste pickup and disposal and certain educational resources, while the "preferred" service adds an OSHA compliance training, evaluation, and guarantee component.

42.     Section 2(b) of the Terms and Conditions addresses increases in the flat fee during the term of the contract.  The operative language states:

> Stericycle reserves the right to adjust the contract price to account for operational changes it implements to comply with documented changes in law, to cover increases in the cost of fuel, insurance, residue disposal, or to otherwise address cost escalation.

43.     The standard form Steri-Safe contract does not contain other language addressing Stericycle's right to increase the flat fee provided for on the cover page of the Steri-Safe Service Agreement.

- 13 -

44.     The Terms and Conditions expressly provide that the Steri-Safe Service
Agreement automatically renews at the end of its term.  They state:

> Subject to the provisions below, the term ("Term") of this
> Agreement shall automatically renew for successive terms equal to
> the original Term (each an "Extension Term") unless either party
> has given sixty (60) days notice, in writing, during the six (6)
> month period prior to the renewal date of its desire to terminate
> this agreement.  All Extension Terms shall be subject to the terms
> and conditions hereunder.

45.     In sum, the standard form Steri-Safe contract stated that Stericycle may increase
its price only to account for "documented changes in law" and "to cover increases in the cost of
fuel, insurance, residue disposal, or to otherwise address cost escalation."

46.     The Steri-Safe contract renews automatically unless the customer provides 60
days' notice of termination.  However, the form Steri-Safe contract does not provide for an
increase in the contract price upon expiration and renewal of the contract.  If the contract
automatically renews according to its terms, Stericycle is obligated to continue to provide service
at the original contract price.  Under the terms of the contract, Stericycle may not increase its
disposal fee except in two circumstances – to account for "operational changes" implemented "to
comply with documented changes in the law" or to "address cost escalation."

47.     Substantially all of Stericycle's remaining SQ customers are "transactional"
customers.  Transactional customers, unlike Steri-Safe customers, do not pay a set monthly fee
for regulated medical waste disposal services.  Rather, transactional customers pay for those
services on an as-needed basis, with agreed pricing for waste disposal services, frequently on a
per-container basis, and related services and supplies.  Stericycle employs a standardized form of
Service Agreement for its transactional customers that contains the choice of law and price
adjustment provisions as its Steri-Safe Service Agreement and is otherwise materially similar to
that agreement other than the manner by which Stericycle charges for its services.

- 14 -

**C.** **Stericycle's Unlawful, Unilateral "Automated Price Increase" Policy**

48.     Despite these clear limitations on the circumstances under which Stericycle could increase the prices it charged to customers, Stericycle in fact engaged in a systematic, widespread and deliberate practice of raising its prices without any connection to increases in its costs or operational changes necessitated by changes in the law governing medical waste disposal.

49.     During the relevant time period, Stericycle imposed an automated price increase ("API") of 18% during a calendar year on all Steri-Safe contract customers.  Stericycle also imposed APIs on transactional customers whose prices were governed by agreements other than Stericycle's standard Steri-Safe contract, but whose terms also did not allow Stericycle to unilaterally raise prices through the imposition of APIs.  On information and belief, none of these arbitrary price increases were tied to or justified by cost increases or operational changes implemented to comply with changes in the law.

50.     Internal Stericycle documents show that Stericycle knew the APIs it imposed were not authorized by the contract. ███████████████████████████████

██████████████████████████████████████████████████

███████████████████████████████████████

████████████████████████████████████

██████████████████████████████████████

████████████████████████████████████████

██████████████████████████████████████

██████████████████████████████████████

██████████████████████████████████

- 15 -

████████████████████████████████████████████

████████████████████████

51.     Still other internal Stericycle documents confirm that the APIs are set at predetermined arbitrary amounts that have no relation to Stericycle's "operational changes," "documented changes in the law," or "cost escalation." ████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████

52.     Stericycle's API policy was never disclosed to its customers or authorized by Stericycle's form contracts.  In fact, Stericycle induced customers to enter into Steri-Safe Service Agreements and other form contracts by characterizing those contracts as providing stable fixed and set fees that the customers would pay for the entire contract term of three to five years.

53.     Stericycle concealed its automated price increase scheme from its customers and the public.  When Stericycle imposed automated price increases on its customers, it did not notify the customer that its prices were being increased, issue any price increase announcements, or provide any notification to its customers that their rates were going up.  Instead, Stericycle simply issued an invoice for the new, inflated price, without notice, explanation or justification. Stericycle never disclosed to its customers or to the public that it applied an API algorithm to its customers' accounts, nor that its practice was to automatically raise the prices it charged to customers with long term "fixed price" agreements.

54.     Stericycle executives have also attempted to conceal the nature of Stericycle's API practices in legal proceedings.  In a deposition dated August 26, 2009, in a suit for improperly charging fuel and energy surcharges ultimately settled by Stericycle, its Chief

- 16 -

Operating Officer, Richard Kogler, was asked under oath what "automated PI" meant, a term that the plaintiff's counsel was clearly unfamiliar with. Mr. Kogler answered, "[i]t means that it's automated within the system, so it's been preset according to the customer's contract." This answer was false, because automated price increases were not mentioned in customers' contracts or charged "according to" those contracts. This false response prevented Stericycle's API policy from being exposed during the deposition.

55.     Stericycle particularly targeted small-quantity customers, which form the vast majority of its client base, with its automated price increase policy, although many of Stericycle's larger customers paid APIs as well. Stericycle targeted small-quantity customers because they were less sophisticated and had far smaller, if any, legal or accounting departments. Therefore, they were less likely to catch Stericycle's automatic 18% price increases, which were invoiced without notice or explanation. And if they did catch it, they were less equipped to challenge whether the price increase was prompted by an increase in Stericycle's actual costs.

56.     Stericycle used an electronic financial accounting and reporting system, named "Tower." The automated price increase process was built into the Tower system, and was designed to impose APIs according to a set schedule, usually in 9 or 12 month intervals. ██████

██████████████████████████████████████████

██████████████████████████████████████████

████████████████████████████

57.     The intervals in which Stericycle imposed APIs varied because Stericycle modulated the timing of the APIs in order to meet revenue targets, without any reference or connection to increases in its costs that might have justified a price increase under the terms of the Steri-Safe Service Agreement. APIs were a major revenue source for Stericycle, and its most

- 17 -

senior executives received monthly reports on the impact of APIs (typically called "API Impact Reports") on Stericycle's overall financial performance.

58.     Tower contained multiple data fields from which the user could select, depending on their needs.  One data field available on Tower is the percentage amount of the last price increase charged any particular customer.  All price increases that Stericycle imposed on small-quantity customers can be determined from the electronic records contained in Stericycle's Tower financial reporting system.

59.     In addition to the last price increase amount, the fields populated with data on Tower include, for example, "Last Price Inc[rease] Date," "PI [Price Increase] exempt," "PI [Price Increase] Max Amt (%)," "PI [Price Increase] Expire Date," and "PI [Price Increase] Reason Code."  A screen shot from the Tower financial reporting system appears as follows:

- 18 -



60.     In the screen shot copied in the foregoing paragraph, an API of 18% is evidenced

in the field in the middle of the screen named "Last Price Inc Amount."

61.     Stericycle did not internally correlate the annual API to its own costs, or to "documented changes in law."

62.     Stericycle's costs did not increase by 18% per year, much less every six or nine months.  Yet Stericycle charged its small-quantity customers an 18% automated price increase each year, or even more frequently.

63.     Stericycle's costs fluctuated from year-to-year.  Stericycle did not modify the amount of the automated price increase to reflect these fluctuations.

64.     Stericycle billed most small-quantity customers on a monthly basis.  It sent customers an invoice that listed as a line-item a description of the charge, which for most customers stated "Steri-Safe."  The invoice then listed a corresponding flat fee, usually monthly, for the Steri-Safe service.

65.     For example, Plaintiff Lyndon Veterinary Clinic's invoice dated November 1, 2009 reflects a single line item charge for:  "Steri-Safe  $56.00."

66.     Plaintiff Lyndon Veterinary Clinic's invoice for the succeeding month, December 1, 2009, also contains a single line item charge:  "Steri-Safe  $66.09."

67.     Thus, Lyndon's December 1, 2009 invoice reflects an API of 18% charged by Stericycle.  Nothing on the invoice calls attention to the fact that the price had increased, explains the price increase, or otherwise provides notice to Lyndon Veterinary Clinic.  The invoice does not include any explanation of how the price increase is related to any "documented changes in law" or escalation of Stericycle's costs, nor did Stericycle send any separate correspondence providing notification or explanation of the price hike.

68.     In addition to charging its customers APIs, Stericycle also increased the prices it charged to its customers by imposing myriad fees and surcharges such as "Environmental /

- 20 -

Regulatory Fees," "Fuel Surcharges," "Energy Fees" or "California SB 1807 Fees" (collectively, the "Undisclosed Fees").

69.     Stericycle frequently hid these fees and failed to disclose them to its customers by embedding them in the supposedly flat fee it charged for the Steri-Safe service.  For example, the May 1, 2011 invoice Stericycle issued to Greater Hampstead Family Medicine simply reflected a single charge of $61.25 for "Steri-Safe."  However, when Greater Hampstead later requested a copy of its past invoices, Stericycle provided an invoice in a different form, disclosing for the first time that the $61.25 charge included charges of $56.00 for "Steri-Safe OSHA-Economy MTH," $1.00 for a "Monthly Energy Charge" and $4.25 for "Monthly Fuel Charge."  Thus, by combining its API and the fees and surcharges it added to customer invoices into one generic "Steri-Safe" fee, Stericycle effectively hid both the amount and existence of its API and the fees and surcharges it was imposing.  Other times, Stericycle disclosed the existence of fees or surcharges, but failed to either disclose the amount of such fees, or the basis or justification.  The effect, however, was the same: Stericycle consistently obfuscated the amount, source or justification for the fees it imposed, making it difficult if not impossible for customers to determine what fees if any were legitimate or the true prices they were being charges for Stericycle's waste disposal services.

70.     Internal Stericycle documents show that it considered fees and surcharges as part of its pricing strategy, without pegging increases in the fees it charged to actual cost increases.

███████████████████████████████████████

█████████████████████████████████████████

██████████████████████████████████████████

████████████████████████████████████████

- 21 -

████████████████████████████████████████████ Thus, it is clear

that Stericycle considered those fees not only as cost recovery measures, but also as a component

of revenue and profit generation.

71.     On information and belief, the fees and surcharges Stericycle charged were

neither tied to any actual fees or costs incurred by Stericycle or permitted under its standard

contracts, or were tied to cost and fee increases Stericycle had already recouped through

automated price increases.  Moreover, Stericycle's imposition of these fees (which at least

purported to have a relationship to Stericycle's regulatory and fuel costs) further underlines the

fact that its practice of imposing APIs bore absolutely no connection to increased costs.

**D.     Stericycle's Misleading and Coercive "Customer Retention" Efforts**

72.     While the vast majority of its customers paid the API, fees and surcharges

Stericycle billed, not all agreed to pay the 18% API or the fees and surcharges for which

Stericycle invoiced them.  Stericycle's business organization included two departments intended

to persuade small-quantity customers to pay as much of the 18% API and fees as possible.

73.     Stericycle maintained a customer complaint department.  In the month that

Stericycle implemented an API, this department routinely received a large number of complaints

from Steri-Safe and other small-quantity customers.  Stericycle closely monitored the number of

complaints it received about its API, as part of its monthly tracking of revenue attributable to

API through its API Impact Reports.  Those and other reports includes analyses of "stick rates,"

or the percentage of customers Stericycle could retain despite having imposed a unilateral,

unauthorized automated price increase.

74.     Stericycle employed various false reasons to justify the API to customers,

especially in the customer complaint department.  When customers objected to the API,

- 22 -

Stericycle employees were directed by management to use false justifications in an attempt to get these customers to back down and acquiesce to these increases.

75.    Difficult customers that refused to agree to Stericycle's API were referred to Stericycle's "customer retention" department.  Stericycle's practice was for the customer complaint department to refer to the customer retention department those customers who refused to agree to the API and threatened to terminate their relationship with Stericycle.  Internal documents show that the customer complaint department was instructed that a customer falling under any of the following circumstances ████████████████████████

████  ████████████████████████████████████████

████  ██████████████████████████████████

████  ██████████████████████████████████████████████

████  ████████████████████████████████████

████  ████████████████████████

For these customers, the retention department was authorized to offer a discount on the API.

76.    Stericycle trained its employees in both the "customer complaint" and "customer retention" departments to give fabricated reasons for the price increases in an attempt to convince customers to pay them. ████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████ as discussed above, Stericycle did not even attempt to track its APIs with costs or operational changes.

77.    Stericycle instructed its customer retention employees to offer fake "price reductions" to get customers to pay as much of the API as possible.  If a customer continued to object despite the false and misleading justifications offered for the API, Stericycle had a system in place to offer the customer "price reductions," which were in fact only reduced price

- 23 -

increases.  For example, ████████████████████████████

████████████████████████████████████████████

████████████████████████  On information and belief, even after agreeing to

reduce a customer's prices or limit the amount by which it would increase a customer's prices,

Stericycle's frequent practice was to return the customer to the 18% API cycle at the next

opportunity.

78.     To the extent that Stericycle may have "rolled back," reversed, credited and/or

refunded any fee or charge at issue in this case, it was not intended to resolve any dispute

between the parties, or to fully satisfy the outstanding claims asserted herein.

79.     Stericycle also had its employees entice certain of its customers with a novation –

new contracts with purportedly lower rates.  Upon information and belief, none of these

Plaintiffs that entered into such a contract have manifested a clear intent to extinguish, waive,

settle, or release any remedies afforded them under the initial contract and/or at issue in this case.

Moreover, Plaintiffs were fraudulently induced to execute any such agreement:  Stericycle did

not sufficiently disclose the full extent of its fraudulent scheme at the time any such novation(s)

were executed.

**E.     Stericycle Knew Its API Policy Was Wrongful, But Chose to Continue Them In Order to Protect Its Revenue**

80.     Stericycle knew since 2004, that several governmental authorities considered

Stericycle's APIs to be an improper practice.  These authorities include New York City, the State

of New Jersey, and the State of Washington.  Based upon these entities' objections, Stericycle

formulated a written policy forbidding the use of the Steri-Safe agreement with its offending API

for use within these jurisdictions.

- 24 -

81.     Stericycle also recognized that its larger, more sophisticated customers were not likely to accept APIs.  Certain large valued corporate clients, dubbed "the Nationals," were exempted from APIs.  Stericycle did not exempt its other customers, however – namely, Steri-Safe and other generally small-quantity customers throughout the nation which lacked either the sophistication or bargaining power of the "Nationals."

82.     The Steri-Safe contract template was used for both private and governmental customers.  By 2006, Stericycle executives were aware that federal government customers objected to Stericycle's API policy.  As a result, in September 2006, Stericycle Vice President Patrick Cott sent an e-mail to his subordinates directing them to stop charging APIs to federal government customers.  While Stericycle understood that the terms of the Steri-Safe Service Agreement did not permit it to continue to charge APIs to the federal government, Stericycle continued to impose APIs on its small-quantity private sector customers.

83.     Mr. Cott's e-mail disclosed the reason that Stericycle continued its API policy despite recognizing that it was unlawful:  it generated a substantial revenue stream to Stericycle.  Mr. Cott wrote to two subordinates:  "Todd/Jerry – please be advised of the potential impact to the PI Impact Analysis reports that Courtenay sends to Mark/Frank/Rich each month, as these accounts will no longer be in the mix for automated PIs and fuel charges, and ***thus you'll lose projected PI revenue with this change.***"  (Emphasis added.)

**F.     The *Qui Tam* Suit**

84.     *Qui tam* Relator Jennifer Perez was hired by Stericycle as a temporary employee in 2004, but soon moved into a full-time position in the collections department.  In that position, Perez began to see that Stericycle was overbilling its governmental and non-governmental customers.  In 2006, Perez was promoted to the position of government specialist and was put in charge of preventing and resolving disputes with the governmental accounts.

- 25 -

85.     Perez discovered that Stericycle was routinely billing all small-quantity customers, including government customers, with annual 18% increases, adding surcharges, and billing such customers in advance of any pickups.  This resulted in gross overcharges to these accounts.

86.     Perez's supervisors routinely admitted to her that they were aware that Stericycle's API practices were improper with respect to the governmental accounts, yet Stericycle continued these practices unabated.

87.     On April 28, 2008, Perez filed a *qui tam* complaint against Stericycle in this Court.  She filed a First Amended *Qui Tam* Complaint on June 28, 2010.  Perez alleged that Stericycle had defrauded the United States, 14 states, and the District of Columbia by imposing an automatic periodic price increase in violation of its contracts with the governmental entities.

88.     Ms. Perez alleged in her amended complaint that Stericycle "has defrauded federal, state and local governments by knowingly or recklessly overcharging its governmental customers and by withholding accurate pricing data from its customers when it agrees to pick up medical waste."  Ms. Perez further alleged that "Stericycle fails to inform its customers that despite the contract price it has agreed to, Stericycle intends to and adds unallowable surcharges to each bill, in addition to an undisclosed 18% across the board increase every 9 months."

89.     The amended complaint further alleges that Ms. Perez was hired by Stericycle as a temporary employee in 2004, but soon moved into a full time position in the collections department.   In that position, [Perez] began to see that Stericycle was overbilling its governmental customers, in many instances in violation of governmental procurement regulations.  In 2006, she was promoted to the position of government specialist, and was put in charge of preventing and resolving disputes with the governmental accounts.  As a result of

- 26 -

her work in that position, [Perez] learned that Stericycle does business with units at all levels of the federal, state, and local governments.

90.     Ms. Perez alleged that she "discovered that Stericycle was routinely billing all small quantity customers, including government customers, with annual 18% increases, adding surcharges, … [and] carried out the practices alleged … across the board with almost all of its small quantity customers."

91.     On January 2, 2013, Stericycle settled the case initiated by Perez with the Attorney General of the State of New York.  In the Settlement Agreement, Stericycle admitted that "[d]uring the period January 1, 2003 through September 30, 2012, with respect to New York Government Customers, Stericycle presented invoices containing automatic price increases not authorized by contracts *viz.* automatic periodic rate increases (automated price increases or "APIs"), that resulted in overpayment for products and services."

92.     The $2.4 million Settlement Agreement between Stericycle and New York provides that Stericycle will reimburse the State for 100 percent of the charges resulting from automated price increases.  Stericycle was alleged to have overcharged nearly 1,000 New York governmental entities, including police and fire departments, rescue squads, schools, jails, and hospitals throughout the state.  In addition, Stericycle agreed to pay treble damages to New York State as a result of the automated price increases.

93.     As part of the settlement with the New York Attorney General, Stericycle agreed to the following:

        a.      Stericycle shall not, in the future, apply any APIs to New York Government Customers.  Any APIs applied to and paid by New York Government Customers after the period of the covered conduct shall be credited to customer accounts.

- 27 -

b.     Stericycle shall provide New York Government Customers sixty-days' written notice of and the reasons for any proposed future rate increases directed to any such customer, and should that customer who receives such notice object to the pending increase, that customer shall be permitted to opt-out, without penalty, of all remaining contractual obligations, upon thirty-days' written notice to Stericycle.

c.     Nothing in this Agreement shall constitute a waiver of the rights of the State of New York to examine or re-examine the books and records of Stericycle to determine that no automated price increases have been applied to New York Government Customers.

94.     Significantly, the state and federal False Claims Act claims asserted in the *qui tam* action only sought relief on behalf of governmental agencies that were improperly overcharged. The New York Attorney General settlement did not provide relief for private entities, such as Plaintiffs and members of the Class.

95.     Perez's complaint brought on behalf of the United States, the remaining 13 states, and the District of Columbia is still pending.

## G.     Plaintiffs' Experience With Stericycle's Automated Price Increases

96.     The Plaintiffs' specific experiences with Stericycle bear out the practices described in the preceding paragraphs and are typical of the experiences of the members of the proposed class.

### 1.     Lyndon Veterinary Clinic.

97.     Lyndon Veterinary Clinic entered into a Steri-Safe Service Agreement with Stericycle on May 21, 2009. The Service Agreement provided that Plaintiff would pay Stericycle a flat monthly fee of $56.00.

- 28 -

98. Stericycle invoiced Plaintiff for $56 per month until June 1, 2009. On that date, Plaintiff's invoice reflected a 3.1% increase in its monthly fee. Then again, on December 1, 2009, Stericycle attempted to charge Plaintiff an 18% increase in its monthly fee.

99. Shortly after receiving the December 1, 2009 invoice, Plaintiff complained to Stericycle that the 18% increase violated his Steri-Safe Service Agreement. Stericycle then rescinded the API, and provided Plaintiff with an "Addendum 'Price Increase' Term and Pricing" that specified that it would experience "a maximum … annual increase of 5%."

100. On June 1, 2009, Plaintiff received an invoice from Stericycle that charged a 5% increase in its monthly fee.

101. On March 1, 2011, Plaintiff received an invoice that charged it an 8.5% increase in its monthly fee. Again five months later, on August 1, 2011, Stericycle imposed on Plaintiff an additional 7.5% price increase. This was followed by a 1.8% price increase in December 2011. In all in 2011, Stericycle charged Plaintiff with price increases totaling 17.8%.

102. On May 1, 2012, Stericycle charged Plaintiff with another price increase, this one of 4.6%. On December 1, 2012, Stericycle charged Plaintiff a price increase of 20.8%. In all, Stericycle's 2012 price increases under Plaintiff's Steri-Safe Service Agreement amounted to 25.4%.

**2. Cochranton Veterinary Hospital.**

103. Cochranton Veterinary Hospital entered into a Steri-Safe Service Agreement with Stericycle on October 21, 2009. The Service Agreement stated that Cochranton Veterinary Hospital would pay a monthly fee of $570 for thirteen stops per year.

104. Despite the agreed upon price in the Service Agreement, Stericycle increased Plaintiff's price without notice by 18% on five separate occasions between January 2010 and March 2013.

- 29 -

105.    For example, between January 2010 and March 2012, Cochranton Veterinary

Hospital's price increased from $579.00 – the agreed contract price – to $1,033.79.  This

aggregate increase of 79% over the agreed upon contract price in only 26 months was the result

of compounding three separate 18% price increases.  These price increases are illustrated in the

chart below:



106.    Cochranton Veterinary Hospital's June and July 2011 invoices also included a

previously undisclosed separate line item for an "Environmental/Regulatory Fee" of $23.78.

That separate line item charge disappeared in August 2011, and was replaced with the statement

that the amount invoiced "Includes Steri-Safe OSHA Compliance (See Next Page For Details)."

However, the "Next Page" simply showed a separate line item for "Environmental/Regulatory

Fee," but without showing the actual amount of that fee.

107.    At the end of November 2012, Cochranton Veterinary Hospital contacted

Stericycle about the excessive price increases.  After Cochranton Veterinary Hospital persisted in

- 30 -

its complaints, Stericycle agreed to cut its monthly charge by approximately 60% in order to retain Cochranton Veterinary Hospital's business.

108.    Stericycle's promised price reduction did not last long.  For the months of January and February 2013, Cochranton was billed $361.38 per month.  In March 2013, however, Stericycle increased Cochranton's monthly charge to $425.80, another price increase of almost 18% from the agreed price.

### 3.    ResearchDx.

109.    ResearchDx entered into a Steri-Safe Service Agreement with Stericycle on or about October 28, 2010.  The Service Agreement stated that ResearchDx would pay a monthly fee of $179 for thirteen stops per year.

110.    Stericycle quickly raised the price it charged ResearchDx beyond the $179 to which it had agreed, both through API and the imposition of fees and surcharges.  For example, by November 1, 2011, Stericycle invoiced ResearchDx for a total of $232.28.  That amount included a charge of $211.22 for the Steri-Safe service (an 18% increase over the agreed price), plus a $4.00 "Monthly Energy Charge," a $10.83 "Monthly Fuel Charge" and a $6.23 "Environmental / Regulatory Fee."

111.    Those charges remained constant until April 1, 2012, when Stericycle's invoice to ResearchDx increased to $276.41, driven by an increase in the line item price for the Steri-Safe service to $249.24 (another 18% increase over the previous rate of $211.22), and a near doubling of the "Environmental / Regulatory Fee" to $12.34.

112.    On June 1, 2013, Stericycle increased its price yet again, invoicing ResearchDx $347.04 for Steri-Safe service and increasing its Fuel Charge and Environmental / Regulatory Fee for a total invoice of $391.16, well over twice the originally contracted price.

- 31 -

113.    After receiving the June invoice, ResearchDx complained to Stericycle about the excessive and unauthorized price increases and requested that Stericycle terminate its service. Stericycle informed ResearchDx that the increases were proper, and that the contract did not allow ResearchDx to terminate its services. When ResearchDx insisted upon cancellation, the Stericycle representative finally assented. However, on September 1, 2013, Stericycle issued an invoice to ResearchDx claiming that it was owed a total of $4,511.52 as "liquidated damages."

### 4.    Amores Dental Care.

114.    Amores entered into a Steri-Safe Service Agreement or about June of 2010 which stated that Stericycle would provide medical waste disposal services for a fixed fee of approximately $291 per month.

115.    In August of 2011, the monthly fee was increased by $52.36 (*i.e.*, 18%) to $343.36. Its bill was increased again in February of 2012 to $462.35. It was increased to approximately $543 in November of 2012, and then increased again to $634 in April of 2013.

### 5.    Drs. McMackin & Zimnoch, P.C.

116.    M&Z entered into a Steri-Safe Service Agreement in or about May of 2010 for a 60 month term. It experienced an API in August of 2011, when its monthly fee increased from $372.21 to $436.22.

117.    M&Z experienced another API in April of 2012 when its fee was increased from $443.26 to $509.69.

118.    M&Z experienced yet another API in October of 2012 when its fee was increased from $509.69 to $598.91. Finally, its fee was increased to $691.40 in or around April of 2013.

- 32 -

6.      **Madison Avenue Professional Building.**

119.    Madison entered into a Steri-Safe Service Agreement with Stericycle in October 2009.  It experienced its first 18% API in July of 2011 when its fee was increased from $299.70 to $353.65.

120.    Madison experienced a second 18% API in March of 2012 when its API was increased from $353.65 to $417.31.

121.    Madison experienced a third 18% API in August of 2012 when its API was increased from $417.31 to $492.43.

122.    Madison experienced a fourth 18% API in March of 2013 when its API was increased from $492.43 to $581.07.

7.      **Greater Hampstead Family Medicine.**

123.    Greater Hampstead Family Medicine entered into a Steri-Safe Service Agreement with Stericycle in or about May 2010.  The May 2010 Service Agreement replaced an earlier agreement with Stericycle for Steri-Safe medical waste collection and disposal services.  Greater Hampstead had discovered that Stericycle had been overcharging it under its earlier agreement, which had provided for a fixed price during the contract term.

124.    Greater Hampstead's May 2010 agreement with Stericycle included an addendum stating that "Customer and Stericycle agree that any price adjustment made pursuant to Paragraph 2(b), within each (12) month period from the effective date of the Agreement, will not exceed 12%."

125.    Nevertheless, Stericycle imposed price increases on Greater Hampstead on nine different occasions between May 2011 and November 2013, resulting in a price by November 2013 that was more than double the contract price.  Those price increases were not tied to any

- 33 -

operational changes or other cost increases that may have justified a price increase under the terms of the Service Agreement.

## H.    Stericycle's Practice of Charging Steri-Safe Customers Automated Price Increases Has Caused Damage to Plaintiffs and the Class

126.    According to Stericycle's 10-K, Stericycle had domestic revenues of $1.37 billion in 2012.  Most of these revenues – 63 percent, or $863 million – were from small-quantity customers.

127.    Further, more of Stericycle's profits come from small-quantity customers. As stated in Stericycle's 2012 10-K, Stericycle achieved "higher gross margins … with our small-quantity customers relative to our large-quantity customers."

128.    A majority of Stericycle's small-quantity customers have the standard form Steri-Safe Service Agreement.  For at least the past five years, most the financial growth in the small-quantity customer segment of Stericycle's business has been because of increased Steri-Safe revenue.

129.    During the relevant period, Stericycle imposed an automatic 18% annual price increase on all Steri-Safe contract customers, and on most small-quantity customers.  In some cases, Stericycle ultimately was able to force the customer to pay only a portion of the 18% API, and in some years Stericycle charged customers price increases of more than 18%.

130.    The APIs charged by Stericycle were not calculated using dollar amounts of the costs incurred by Stericycle, whether for changes in law, fuel, insurance, residue disposal, or other costs.

131.    Column E of the table below shows, for the years 2006 through 2012, the revenue Stericycle unlawfully earned from small-quantity customers if it recouped from them the 18% API that was its standard policy and practice, based on Stericycle's annual form 10-K reports

- 34 -

filed with the United States Securities and Exchange Commission. The exact amount of Stericycle's unlawful overcharges of its small-quantity customers can be easily derived from the data maintained on Stericycle's Tower electronic financial accounting and reporting system, which is in the exclusive control of Stericycle.

| A Year | B Total domestic revenue ($) | C Total domestic revenue from small-quantity customers (%) | D Total domestic revenue from small-quantity customer ($) | E 18% of D |
|---|---|---|---|---|
| 2012 | $1,370,000,000 | 63% | $863,100,000 | $155,358,000 |
| 2011 | 1,210,000,000 | 63% | 762,300,000 | 137,214,000 |
| 2010 | 1,080,000,000 | 63% | 680,200,000 | 122,472,000 |
| 2009 | 912,600,000 | 63% | 574,938,000 | 103,489,000 |
| 2008 | 830,800,000 | 63% | 523,404,000 | 94,212,000 |
| 2007 | 721,400,000 | 63% | 454,482,000 | 81,807,000 |
| 2006 | 616,400,000 | 63% | 388,322,000 | 69,900,000 |

## V.    CLASS ACTION ALLEGATIONS

132.    Plaintiffs bring this action pursuant to Rule 23(a), 23(b)(2) and 23(b)(3) of the Federal Rules of Civil Procedure, on behalf of themselves and the members of the following Class:

All persons and entities that, between March 8, 2003, through the date of trial resided in the United States (except Washington and Alaska), were identified by Stericycle as a "Small Quantity" or "SQ" customer, and were charged and paid more than their contractually-agreed price for Stericycle's medical waste disposal goods and services pursuant to Stericycle's automated price increase policy. Governmental entities whose claims were asserted in *United States ex rel. Perez v. Stericycle Inc.* shall be excluded from the class.

- 35 -

133.     Excluded from the Class are Defendant, any entity in which Defendant has a controlling interest or which has a controlling interest in Defendant, and Defendant's legal representatives, predecessors, successors, assigns, and employees, as well as governmental entities whose claims are asserted in *United States ex rel. Perez v. Stericycle, Inc*. Residents of Washington, whose rates are regulated by the government and set by tariff, are also excluded. Residents of Alaska are excluded because it does not appear that there are any members of the proposed class in Alaska.

134.     The definition of the Class is unambiguous. Plaintiffs are members of the Class they seek to represent. Members of the Class can be identified using Defendant's records of contracts and other information that is kept by Defendant in the usual course of business and/or in the control of Defendant. Records kept by Defendant identify the Class members who entered into a Steri-Safe Service Agreement or other small-quantity waste disposal contracts with Defendant. The members of the Class can be notified of the Class action through publication and direct mailings to address lists maintained in the usual course of business by Defendant.

135.     Pursuant to Rule 23(a)(1), Class members are so numerous that their individual joinder is impracticable. As of December 31, 2012, Stericycle had over 500,000 small-quantity waste disposal customers, and a majority of these customers are potential Class members. The precise number of Class members has been calculated by Plaintiffs to include 256,405 current and former Stericycle customers; a number that clearly renders joinder impossible.

136.     Pursuant to Rule 23(a)(2) and (b)(3), questions of fact and law, except as to the amount of damages each member of the Class sustained, are common to the Class. Common questions of law and fact predominate over the questions affecting only individual Class members. Some of the common legal and factual questions include:

(a)     Whether Defendant used standard form contracts with its small-quantity customers that charged a flat fee for regulated medical waste disposal;

(b)     Whether the claims of Plaintiffs and the Class are governed by a choice-of-law provision in Defendant's standard form contracts, and whether pursuant to that provision Illinois law governs their claims;

(c)     Whether Defendant imposed an automated price increase on small-quantity waste disposal customers who entered into fee-based medical waste disposal contracts with Stericycle;

(d)     Whether Defendant's standard form contracts with its small-quantity medical waste disposal customers provided that Defendant could adjust the contract price only to account for operational changes it implemented to comply with documented changes in law, to cover increases in the cost of fuel, insurance, residue disposal, or to otherwise address cost escalation.

(e)     Whether Defendant's APIs were authorized by its standard form contracts;

(f)     Whether Defendant calculated its API using dollar amounts of the costs it incurred, whether for changes in law, fuel, insurance, residue disposal, or other costs;

(g)     Whether Defendant programmed its financial accounting and reporting systems to apply a periodic 18% price increase automatically to small-quantity medical waste disposal customer accounts.

(h)     Whether Defendant maintained its financial accounting and reporting systems to track APIs imposed on small-quantity waste disposal customers;

(i)     Whether Defendant instructed employees in its office responsible for responding to customer complaints to give customers pretextual reasons to justify APIs;

(j)     Whether Defendant disclosed its policy to impose APIs to its small-quantity medical waste disposal customers;

(k)     Whether Defendant breached its contracts with Plaintiffs and Class members;

(l)     Whether Defendant's conduct violated the Illinois Uniform Deceptive Trade Practices Act;

(m)     Whether Defendant defrauded Plaintiffs and members of the Class in violation of applicable consumer protection laws; and

(n)     The nature and extent of damages and other remedies to which the conduct of Defendant entitles Plaintiffs and the Class members.

137.     Defendant engaged in a common course of conduct giving rise to the legal rights sought to be enforced by Plaintiffs and the Class members.  A single, common policy to impose automated price increases not calculated based on costs incurred by Defendant is at issue in this case, along with Defendant's consistent, uniform practice of offering false and misleading information to induce contract formation and prevent customers from noticing price increases or terminating contracts when they did notice the increased prices.  Individual questions, if any, pale by comparison to the numerous common questions that dominate.

138.     The injuries sustained by the Class members flow, in each instance, from a common nucleus of operative facts, Defendant's misconduct.  Each Class member was invoiced for an automated price increase that was not calculated using dollar amounts of the costs Defendant incurred and was not authorized by the Class member's contract.  Defendant engaged in a common scheme and practice of offering false and misleading information to induce entry into the contracts, and once the contracts were executed, engaged in further fraudulent conduct in concealing the price increases, offering false and misleading information regarding the price increases as well as illusory "price reductions" to customers who complained about its pricing practices.

139.     Pursuant to Rule 23(a)(3), Plaintiffs' claims are typical of the claims of the other members of the Class.  Plaintiffs, like other members of the Class, paid an automated price increase that was not calculated using dollar amounts of the costs Defendant incurred and was not authorized by its contract with Defendant, were induced to enter into the contracts by fraudulent and misleading representations, and had the true nature and existence of Defendant's API practices concealed from them.  Plaintiffs were subject to, and were financially harmed by, a

- 38 -

common policy and practice applied by Defendant to all Class members to charge automated price increases, offer misleading and false information, and conceal material facts both in the execution and administration of the contracts.

140.     Pursuant to Rule 23(a)(4) and (g)(1), Plaintiffs will fairly and adequately protect the interests of the Class.  Plaintiffs are familiar with the basic facts that form the bases of the Class members' claims.  Plaintiffs' interests do not conflict with the interests of the other Class members that they seek to represent.  Plaintiffs have retained counsel competent and experienced in class action litigation and intend to prosecute this action vigorously.  Interim lead counsel has successfully prosecuted complex class actions, including consumer protection class actions. Plaintiffs and their counsel will fairly and adequately protect the interests of the Class members.

141.     Pursuant to Rules 23(b)(3), a class action is superior to other available methods for the fair and efficient adjudication of this controversy because joinder of all Class members is impracticable.  The prosecution of separate actions by individual members of the Class would impose heavy burdens upon the courts and Defendant, and would create a risk of inconsistent or varying adjudications of the questions of law and fact common to the Class.  A class action would achieve substantial economies of time, effort and expense, and would assure uniformity of decision as to persons similarly situated without sacrificing procedural fairness.

142.     Individual litigation of the legal and factual issues raised by the conduct of Defendant would increase delay and expense to all parties and to the court system.  The class action device presents far fewer management difficulties and provides the benefits of a single, uniform adjudication, economies of scale and comprehensive supervision by a single court. Given the similar nature of the claims of the members of the Class and the uniform application of

- 39 -

Illinois law to most if not all of the claims of Plaintiff and the members of the Class, the Class's claims will be effectively managed by the Court and the parties.

## VI.  CHOICE OF LAW

143.   The "Governing Law" section of the Service Agreement states that "[t]his Agreement shall be governed by and constructed in accordance with the laws of the State of Illinois without regard to the conflicts of laws or rules of any jurisdiction."

144.   Pursuant to this Choice of Law provision and the RESTATEMENT (SECOND) OF CONFLICT OF LAWS § 187, Illinois law applies to the claims of Plaintiffs and the Class.

145.   The conduct and claims in this case have a substantial connection to Illinois. Stericycle maintains its principal place of business in Lake Forest, Illinois (from where its deceive conduct primarily and substantially emanated).  Upon information and belief, Plaintiffs' Service Agreements were received and approved by Stericycle in Illinois, and Stericycle required Plaintiffs to submit their payments to an address in Carol Stream, Illinois.  Stericycle also maintained its financial and billing systems in Illinois, and used its automated systems to apply the APIs to customer accounts and issued invoices reflecting those price increases in Illinois. Stericycle's customer service representatives were also based in Illinois, and the uniform scripts and "talk tracks" they used to misinform and mislead customers about the justifications for APIs were generated by management personnel in Illinois.  Under the circumstances, it may be said that the transactions at issue took place primarily and substantially within the State of Illinois.

146.   In the alternative, should the Court find that the Illinois Consumer Fraud and Deceptive Business Practices Act, 815 ILCS § 505/2 and/or Illinois Uniform Deceptive Trade Practices Act, 815 ILCS § 510/2 cannot be applied to the proposed nationwide class of Stericycle customers, Plaintiffs assert claims under the consumer protection laws the jurisdictions specified below, in which members of the proposed class reside.

- 40 -

## VII.   TOLLING OF STATUTES OF LIMITATION

147.    Any applicable statute of limitations has been tolled by Defendant's knowing and active concealment of its deceptive practices.  Plaintiffs and members of the Class could not have reasonably discovered the true extent of its overbilling practices until shortly before this class action litigation was commenced.

148.    As a result of the active concealment by Defendant, any and all applicable statutes of limitations otherwise applicable to the allegations herein have been tolled.

## VIII.   CAUSES OF ACTION

### COUNT I

### BREACH OF CONTRACT AND BREACH OF THE COVENANT OF GOOD FAITH AND FAIR DEALING (ILLINOIS LAW)

149.    Plaintiffs reallege and incorporate by reference the preceding allegations as if fully set forth above.

150.    Defendant formed agreements and entered into valid and enforceable contracts with Plaintiffs and members of the Class including offer, acceptance, and consideration. Defendant provided Plaintiffs and members of the Class with a written standard form agreement drafted by Defendant, and Plaintiffs and members of the Class accepted Defendant's offer and exchanged consideration by using Defendant's services and paying for them.  Specifically, and as discussed above, the parties' contractual relationships were defined by Stericycle's Steri-Safe Service Agreements and other agreements between Stericycle and its customers.

151.    Plaintiffs and members of the Class have performed all, or substantially all, of the obligations imposed on them under their contracts with Defendant.

152.    Plaintiffs and members of the Class paid regulated medical waste disposal fees demanded by Stericycle.

- 41 -

153.     Section 2(b) of the Steri-Safe Service Agreement and other Stericycle standardized Service Agreements gives Stericycle the ability to unilaterally "adjust the contract price to account for operational changes it implements to comply with documented changes in law, to cover increases in the cost of fuel, insurance, or residue disposal, or to otherwise address cost escalation."

154.     Defendant breached its agreements with Plaintiffs and members of the Class by routinely charging an automated price increase and imposing other Undisclosed Fees that bore no relation to costs Defendant incurred or the fees paid for medical waste disposal services. Such automated increases and Undisclosed Fees were not provided for in the contracts or agreed to by Plaintiffs and members of the Class.  Specifically, Stericycle's practice of systematically imposing arbitrary 18% price increases was not to account for "operational changes" it implemented "to comply with documented changes in the law," to cover its cost increases, or to "address cost escalation."

155.     Good faith is an element of every contract in Illinois.  In Illinois, all contracts impose upon each party a duty of good faith and fair dealing.  Good faith and fair dealing are violated by a party's refusal to comply with contract terms despite knowledge that it was violating the contract and knowledge that refusal would result in serious damage.  Examples of bad faith include where a party interprets a contract in an unreasonable manner, and where it uses abusive or coercive practices designed to compel compromise on a claim.

156.     In this case, Defendant engaged in the following conduct that breached its duty of good faith and fair conduct:  (1) Defendant charged automated price increases undisclosed and unauthorized by its contract with Plaintiffs and the Class; (2) Defendant used standard form contracts that it drafted with lengthy Terms and Conditions that were difficult to read and, often,

- 42 -

transmitted to Class members in illegible form; (3) Defendant intentionally drafted loose language in order to create ambiguity over the basis and legal justification for automated price increases, knowing that its small-quantity customers were not legally sophisticated; (4) Defendant incorporated long-terms into its standard form contracts and incorporated automatic renewal and burdensome cancellation provisions; (5) Defendant concealed the true reasons for APIs, fees and surcharges from small-quantity customers and adopted an organizational structure designed to maximize payment of APIs from customers who complained; (6) a large portion of Defendant's profit and revenue were derived from illegal APIs; and (7) Defendant knew its practice of charging APIs was wrong and had been rejected by governmental authorities, but it continued to impose APIs on customers who were unaware of them.

157.    Since at least 2003, Stericycle has breached the covenant of good faith and fair dealing in its agreements with Plaintiffs and members of the Class through its API policies and practices as alleged herein.

158.    Defendant had an implied duty of good faith and fair dealing to Plaintiffs and the Class.  Pursuant to that duty, Plaintiffs and the Class had a reasonable and justified expectation that they would not be charged automated price increases.  They had a reasonable and justified expectation that the fee they paid Defendant would not increase automatically, unrelated to changes in Stericycle's costs for providing its services.  Defendant breached that duty when it charged Plaintiffs and the Class APIs and assessed other fees.

159.    As a direct and proximate result of Defendant's breaches of its agreements, Plaintiffs and the Class have suffered damages in an amount to be proven at trial.

160.     Any payments made by Plaintiffs and Class members to Stericycle were not voluntary in that they were procured as a result of Stericycle's contractual breaches and other misconduct (and/or were made under the mistaken notion that Stericycle was *not* imposing extra-contractual fees and charges).  The material facts concerning Stericycle's pricing scheme were concealed from and inaccessible to Plaintiffs; thus, any such payments were not made with full knowledge of Stericycle's deliberately concealed fraudulent scheme.  Moreover, Plaintiffs were coerced to make their payments to Stericycle, as their failure to do so would have resulted in disastrous consequences to the business of Plaintiffs and Class members (*i.e.*, their medical waste pickup and disposal services could have been suspended).

## COUNT II

### VIOLATIONS OF THE ILLINOIS CONSUMER FRAUD AND DECEPTIVE BUSINESS PRACTICES ACT, 815 ILCS § 505/1, *et seq.*, AND ILLINOIS UNIFORM DECEPTIVE TRADE PRACTICES ACT, 815 ILCS § 510/2

161.     Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

162.     Defendant engaged in an unfair or deceptive act or practice by imposing automated price increases and charging undisclosed fees.  Defendant knew that its practice was not authorized by its contracts with Plaintiffs and the Class, but it nevertheless used various forms of pressure and trickery to force small-quantity customers to pay as much of the APIs as possible.

163.     Defendant further engaged in unfair or deceptive acts or practices by knowingly or willfully concealing, suppressing or omitting materials facts from Plaintiffs and members of the Class and by making affirmative misrepresentations in order to induce Plaintiffs and members of the Class to enter into medical waste disposal contracts and/or remain Stericycle customers.  Defendant's scheme included concealing that its agreements were not actually fixed-

- 44 -

price agreements, and that it used an automated price increase algorithm in its computer system to increase customers' fees, lying to customers about the rates that would be charged, issuing invoices to customers reflecting prices greater than those authorized by their contracts and without notice of the price increase, imposing Undisclosed Fees purporting to reflect regulatory, fuel and energy costs knowing that those fees bore no relation to such costs or that Stericycle had already recouped those fees through price increases, giving customers fabricated and misleading rationales for price increases, offering discounts on APIs only to complaining customers and only if they threatened to cease using Defendant's services, and imposing APIs on customers even after agreeing to reduce the contract price following customer complaints. Defendant's material misstatements and omissions were likely to and did in fact deceive reasonable customers, including Plaintiffs, about Stericycle's services and the prices they would be and were in fact charged.

164. Defendant's practice offended public policy, was immoral, unethical, oppressive, and unscrupulous, and caused substantial injury to consumers.

165. Buyers such as Plaintiffs and members of the Class would have acted differently knowing that Defendant imposed APIs, and APIs concerned the type of information upon which a buyer would be expected to rely in making a decision whether to purchase. Plaintiffs and members of the Class would have wanted to know, as would any reasonable person, that Defendant imposed automated price increases that bore no relation to its actual costs, and this information would have changed their and any reasonable customer's decision to use Defendant's services. Plaintiffs and members of the Class would have wanted to know that the amounts reflected on the invoices Stericycle issued to them did not accurately reflect the amount

- 45 -

they were actually obligated to pay pursuant to their agreement with Stericycle, and would not have paid the excess charges had they known the truth.

166.    Defendant intended that Plaintiffs and members of the Class would rely on its misrepresentations as well as the material facts that it concealed, suppressed and omitted, as described above.  Among other things, Defendant intended that Plaintiffs and members of the Class rely upon its representations that their regulated medical waste disposal fees would be fixed for the term of the contract and only increase for the reasons stated in the contract. Defendant also intended that Plaintiffs and members of the Class rely upon the invoices it issued as accurate statements of amounts properly owing, as well as upon the other statements it made in attempting to justify price increases to complaining customers.  Plaintiffs and members of the Class relied upon Defendant's fraudulent and misleading statements, concealments, suppressions, and omissions, and as a result paid higher fees than they would have absent Defendant's wrongful conduct.

167.    Defendant's conduct is a violation of the Illinois Uniform Deceptive Trade Practices Act, 815 ILCS § 510/2.  As a violation of Section 2 of the Illinois Uniform Deceptive Trade Practices Act, Defendant's conduct is a violation of Section 2 of the Illinois Consumer Fraud and Deceptive Business Practices Act, 815 ILCS § 505/2.

168.    Defendant's unfair or deceptive act or practice occurred in the course of conduct involving trade or commerce, and was directed to the market in general.  The complained-of conduct in this case implicates consumer protection concerns.

169.    Defendant's unfair or deceptive acts or practices proximately caused injury and ascertainable loss to Plaintiffs and members of the Class.

- 46 -

170.     Plaintiffs and the Class are entitled to actual damages, punitive damages, and reasonable attorneys' fees and costs, as well as any other relief the Court deems proper.

## COUNT III

### VIOLATIONS OF THE ARIZONA CONSUMER FRAUD ACT
### (ARIZ. REV. STAT. § 44-1521, *et seq.*)

171.     Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

172.     Plaintiffs, members of the Class and Defendant are each "persons" as defined by ARIZ. REV. STAT. § 44-1521(6).  The medical waste disposal service Stericycle sold to Plaintiffs and the Class are "merchandise" as defined by ARIZ. REV. STAT. § 44-1521(5).

173.     The Arizona Consumer Fraud Act proscribes "[t]he act, use or employment by any person of any deception, deceptive act or practice, fraud, false pretense, false promise, misrepresentation, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale or advertisement of any merchandise whether or not any person has in fact been misled, deceived or damaged thereby."  ARIZ. REV. STAT. § 44-1522(A).

174.     Stericycle willfully failed to disclose and actively concealed material facts regarding the prices it charged its customers, the reasons for price increases it imposed, and the amounts owed to it for services it performed as described above.  Accordingly, Stericycle engaged in unlawful trade practices, including advertising its Steri-Safe service with the intent not to sell them at the prices it advertised; omitting material facts in describing its services and the prices it would charge; and representing that its agreements with its customers conferred or involves rights, remedies, or obligations which they did not confer or involve.  By concealing and omitting material information from Plaintiffs and the Class and by making affirmative

- 47 -

misrepresentations as described above, Defendant engaged in deceptive business practices prohibited by the Arizona Consumer Fraud Act, ARIZ. REV. STAT. § 44-1522(A). Stericycle's material omissions and misrepresentations were made with the intent that Plaintiffs and the Class would rely upon them, and Plaintiffs and the Class did in fact rely upon those material omissions and misstatements.

175.    Stericycle's unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers, including Plaintiffs.

176.    Plaintiffs and the Class sustained damages as a result of the Defendant's unlawful acts and are, therefore, entitled to damages and other relief as provided under the Arizona Consumer Fraud Act.

177.    Plaintiffs also seek court costs and attorneys' fees as a result of Defendant's violation of the Arizona Consumer Fraud Act as provided in ARIZ. REV. STAT. § 12-341.01.

## COUNT IV

### VIOLATIONS OF THE ARKANSAS DECEPTIVE TRADE PRACTICES ACT
### (ARK. CODE ANN. § 4-88-101 *et seq.*)

178.    Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

179.    Plaintiffs, members of the Class and Defendant are each "persons" as defined by ARK. CODE ANN. § 4-88-102(5). The medical waste disposal service Stericycle sold to Plaintiffs and the Class are "Services" as defined by ARK. CODE ANN. § 4-88-102(7).

180.    The Arkansas Deceptive Trade Practices Act proscribes "[d]eceptive and unconscionable trade practices," and "[t]he act, use or employment by any person of any deception, fraud or false pretense" or the "concealment, suppression or omission of any material fact with intent that others rely upon the concealment, suppression or omission" when done "in

- 48 -

connection with the sale or advertisement of any goods, [or] services …." ARK. CODE ANN. §§ 4-88-107, 108.

181.     Stericycle willfully failed to disclose and actively concealed material facts regarding the prices it charged its customers, the reasons for price increases it imposed, and the amounts owed to it for services it performed as described above.  Accordingly, Stericycle engaged in unlawful trade practices, including advertising its Steri-Safe service with the intent not to sell them at the prices it advertised; omitting material facts in describing its services and the prices it would charge; and representing that its agreements with its customers conferred or involves rights, remedies, or obligations which they did not confer or involve.  By concealing and omitting material information from Plaintiffs and the Class and by making affirmative misrepresentations as described above, Defendant engaged in deceptive business practices prohibited by the Arkansas Deceptive Trade Practices Act, ARK. CODE ANN. § 4-88-101, *et seq*. Stericycle's material omissions and misrepresentations were made with the intent that Plaintiffs and the Class would rely upon them, and Plaintiffs and the Class did in fact rely upon those material omissions and misstatements.

182.     Stericycle's unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers, including Plaintiffs.

183.     Plaintiffs and the Class sustained actual damages or injury as a result of the Defendant's unlawful acts and are, therefore, entitled to damages and other relief as provided under the Arkansas Deceptive Trade Practices Act.

184.     Plaintiffs also seek court costs and attorneys' fees as a result of Defendant's violation of the Arkansas Deceptive Trade Practices Act as provided in ARK. CODE ANN. § 4-88-113(f).

- 49 -

## COUNT V

### VIOLATIONS OF THE CALIFORNIA UNFAIR COMPETITION LAW
(CAL. BUS. & PROF. CODE § 17200, *et seq.*)

185. Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

186. The California Unfair Competition Law ("UCL") prohibits acts of "unfair competition," including any "unlawful, unfair or fraudulent business act or practice" and "unfair, deceptive, untrue or misleading advertising." CAL BUS. & PROF. CODE § 17200.

187. Stericycle has engaged in unfair competition and unfair, unlawful or fraudulent business practices by its conduct, statements, and omissions described above. In addition, Stericycle has engaged in unfair competition by asserting a contractual right which it did not have, and by engaging in fraud and deceit.

188. The acts engaged in by Stericycle are fraudulent and show a pattern of untruthful statements, false representations, concealment, intent to mislead, and a conspiracy to defraud that were all part of a scheme to mislead.

189. These acts and practices have deceived Plaintiffs and are likely to deceive the public. Stericycle's violations of the UCL and caused injuries to Plaintiffs and Class members.

190. The injuries suffered by Plaintiffs and Class members are greatly outweighed by any potential countervailing benefit to consumers or to competition. Nor are they injuries that Plaintiffs and Class members should have or could have reasonably avoided.

191. Stericycle's representations and acts as set out above induced Plaintiffs and others similarly situated to pay the amounts charged by Stericycle, allowing it to collect sums never agreed to by customers. Plaintiffs reserve the right to identify additional violations by Stericycle as may be established through discovery.

- 50 -

192.     As a direct and legal result of its unlawful, unfair, and fraudulent conduct described above, Defendant has been unjustly enriched.  Specifically, Stericycle has been unjustly enriched by the receipt of large sums of ill-gotten gains from the deceptive and excessive monthly charges they have levied on customers.

193.     Pursuant to California Business and Professions Code section 17203, Plaintiffs seek an order of this Court:

   a.     Compelling Stericycle to make restitution to the general public for all funds unlawfully, unfairly, or fraudulently obtained by Stericycle as a result of its violations of California Business and Professions Code section 17200 *et seq.*;

   b.     Declaring that Stericycle has violated the provisions of California Business & Professions Code section 17200, and California Business and Professions Code section 17500, and any other statutory violations; and

   c.     Enjoining and restraining Stericycle from charging and collecting additional unauthorized monthly charges from customers.

194.     In prosecuting this action for the enforcement of important rights affecting the public interest, Plaintiffs seek to recover attorney fees under (i) section 1021.5 of the Code of Civil Procedure and/or (ii) the "common fund" doctrine available to a prevailing plaintiff who wins restitutionary relief for the general public.

## COUNT VI

### VIOLATION OF CALIFORNIA FALSE ADVERTISING LAW
#### (CAL. BUS. & PROF. CODE §§ 17500, *et seq.*)

195.     Plaintiffs incorporate by reference all allegations of the preceding paragraphs as though fully set forth herein.

- 51 -

196.     California Bus. & Prof. Code § 17500 states:  ""It is unlawful for any …

corporation … with intent directly or indirectly to dispose of real or personal property … to

induce the public to enter into any obligation relating thereto, to make or disseminate or cause to

be made or disseminated … from this state before the public in any state, in any newspaper or

other publication, or any advertising device, … or in any other manner or means whatever,

including over the Internet, any statement … which is untrue or misleading, and which is known,

or which by the exercise of reasonable care should be known, to be untrue or misleading."

197.     Stericycle caused to be made or disseminated through California and the United

States, through advertising, marketing and other publications, statements that were untrue or

misleading, and which were known, or which by the exercise of reasonable care should have

been known to Stericycle, to be untrue and misleading to Plaintiffs and the other Class members.

198.     Stericycle has violated § 17500 because its misrepresentations and omissions

regarding the prices it charged, its policies and practices relating to APIs, and the justifications it

gave for imposing APIs detailed in this Complaint were material and likely to deceive a

reasonable consumer.

199.     Plaintiffs and the other Class members have suffered an injury in fact, including

the loss of money or property, as a result of Stericycle's unfair, unlawful, and/or deceptive

practices.  In choosing to contract with or remain customers of Stericycle, Plaintiffs and the other

Class members relied on the misrepresentations and/or omissions of Stericycle with respect to

the price they would pay, the legitimacy of charges reflected on invoices issued by Stericycle,

and justifications asserted for APIs Stericycle imposed upon them.  Had Plaintiffs and the other

Class members known the true facts, they would not have agreed to enter into a contract with

Stericycle, remained Stericycle customers, and/or paid as much for regulated medical waste

- 52 -

collection and disposal services.  Accordingly, Plaintiffs and the other Class members overpaid and did not receive the benefit of their bargain.

200.    All of the wrongful conduct alleged herein occurred, and continues to occur, in the conduct of Stericycle's business.  Stericycle's wrongful conduct is part of a pattern or generalized course of conduct that was perpetuated and repeated, both in the State of California and nationwide.

**COUNT VII**

**VIOLATIONS OF THE COLORADO CONSUMER PROTECTION ACT**
(COLO. REV. STAT. § 6-1-101, *et seq.*)

201.    Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

202.    Colorado's Consumer Protection Act (the "CCPA") prohibits a person from engaging in a "deceptive trade practice," which includes making "false or misleading statements of fact concerning the price of goods, services, or property or the reasons for, existence of, or amounts of price reductions."  COLO. REV. STAT. § 6-1-105(1)(b), (e).  The CCPA further prohibits "represent[ing] that goods … are of a particular standard, quality, or grade … if he knows or should know that they are of another," and "advertis[ing] goods … with intent not to sell them as advertised," and failing "to disclose material information concerning goods, services, or property which information was known at the time of an advertisement or sale if such failure to disclose such information was intended to induce the consumer to enter into a transaction."  COLO. REV. STAT. § 6-1-105(1)(l), (u).

203.    Stericycle is a "person" within the meaning of COLO. REV. STAT. § 6-1-102(6).

204.    In the course of Stericycle's business, it made false and misleading statements concerning the price of the services it offered and the reasons for, existence of or amounts of

- 53 -

price reductions it offered to customers who complained about price increases.  Stericycle also

willfully misrepresented, failed to disclose, and actively concealed material information

concerning the medical waste collection and disposal services it offered with the intent to induce

Plaintiffs and members of the Class to enter into agreements and /or remain Stericycle

customers, and otherwise engaged in conduct likely to deceive.  Accordingly, Stericycle engaged

in unlawful trade practices prohibited by the Colorado Consumer Protection Act.

205.    Stericycle's actions as set forth above occurred in the conduct of trade or

commerce.

206.    Stericycle's conduct proximately caused injuries to Plaintiffs and the other Class

members.  Stericycle's material misstatements and omissions were intended to, and had the

capacity to deceive consumers, to attract consumer's to Stericycle's services, and to induce a

party to act or refrain from acting.  Plaintiffs were induced to act or refrain from acting by

Stericycle's false and misleading statements and omissions.

207.    Plaintiffs and the Class members were injured as a result of Stericycle's conduct

in that Plaintiffs and the Class overpaid for medical waste collection and disposal services and

did not receive the benefit of their bargain.  These injuries are the direct and natural consequence

of Stericycle's misrepresentations and omissions

## COUNT VIII

### VIOLATIONS OF THE CONNECTICUT UNFAIR TRADE PRACTICES ACT
### (Conn. Gen. Stat. Ann. § 42-110A, *et seq.*)

208.    Plaintiffs reallege and incorporate by reference all paragraphs as though fully set

forth herein.

209.    Plaintiffs and Defendant are "persons" as defined by CONN. GEN. STAT. ANN.

§ 42-110a(3).

- 54 -

210.    The Connecticut Unfair Trade Practices Act ("CUTPA") provides that "[n]o person shall engage in unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce. CONN. GEN. STAT. ANN. § 42-110b(a). The CUTPA further provides a private right of action under CONN. GEN. STAT. ANN. § 42-110g(a).

211.    Stericycle willfully failed to disclose and actively concealed material facts regarding the prices it charged its customers, the reasons for price increases it imposed, and the amounts owed to it for services it performed as described above. Accordingly, Stericycle engaged in unlawful trade practices, including advertising its Steri-Safe service with the intent not to sell them at the prices it advertised; omitting material facts in describing its services and the prices it would charge; and representing that its agreements with its customers conferred or involves rights, remedies, or obligations which they did not confer or involve. By concealing and omitting material information from Plaintiffs and the Class and by making affirmative misrepresentations as described above, Defendant engaged in deceptive business practices prohibited by the CUTPA. Stericycle's material omissions and misrepresentations were made with the intent that Plaintiffs and the Class would rely upon them, and Plaintiffs and the Class did in fact rely upon those material omissions and misstatements.

212.    Stericycle's unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers, including Plaintiffs.

213.    Plaintiffs and the Class sustained damages as a result of the Defendant's unlawful acts and are, therefore, entitled to damages and other relief as provided under the CUTPA.

214.    Plaintiffs also seek court costs and attorneys' fees as a result of Defendant's violation of the CUTPA as provided in CONN. GEN. STAT. ANN. § 42-110g(d). A copy of this

Complaint has been mailed to the Attorney General and the Commissioner of Consumer

Protection of the State of Connecticut in accordance with CONN. GEN. STAT. ANN. § 42-110g(c).

## COUNT IX

### VIOLATIONS OF THE DELAWARE CONSUMER FRAUD ACT
(6 DEL. CODE § 2513, *et seq.*)

215.    Plaintiffs reallege and incorporate by reference all paragraphs as though fully set

forth herein.

216.    The Delaware Consumer Fraud Act ("CFA") prohibits the "act, use or

employment by any person of any deception, fraud, false pretense, false promise,

misrepresentation, or the concealment, suppression, or omission of any material fact with intent

that others rely upon such concealment, suppression or omission, in connection with the sale,

lease or advertisement of any merchandise, whether or not any person has in fact been misled,

deceived or damaged thereby."  6 DEL. CODE § 2513(a).

217.    Stericycle is a person with the meaning of 6 DEL. CODE § 2511(7).

218.    As described herein Stericycle willfully failed to disclose and actively concealed

material facts regarding the prices it charged its customers, the reasons for price increases it

imposed, and the amounts owed to it for services it performed as described above.  Accordingly,

Stericycle engaged in unlawful trade practices, including advertising its Steri-Safe service with

the intent not to sell them at the prices it advertised; omitting material facts in describing its

services and the prices it would charge; and representing that its agreements with its customers

conferred or involves rights, remedies, or obligations which they did not confer or involve.  By

concealing and omitting material information from Plaintiffs and the Class and by making

affirmative misrepresentations as described above, Defendant engaged in deceptive business

practices prohibited by the Delaware Consumer Fraud Act.  Stericycle's material omissions and

misrepresentations were made with the intent that Plaintiffs and the Class would rely upon them, and Plaintiffs and the Class did in fact rely upon those material omissions and misstatements.

219.     Stericycle's actions as set forth above occurred in the conduct of trade or commerce.

220.     Stericycle's conduct proximately caused injuries to Plaintiffs and the Class.

221.     Plaintiffs are entitled to recover damages, as well as costs and reasonable attorney fees as provided by the Delaware Consumer Fraud Act.

**COUNT X**

**VIOLATIONS OF THE DELAWARE DECEPTIVE TRADE PRACTICES ACT**
(6 DEL. CODE § 2532, *et seq.*)

222.     Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

223.     Delaware's Deceptive Trade Practices Act ("DTPA") prohibits a person from engaging in a "deceptive trade practice," which includes:  "(9) Advertis[ing] goods or services with intent not to sell them as advertised"; "(11) Makes false or misleading statements of fact concerning the reasons for, existence of, or amounts of, price reductions," or "(12) Engag[ing] in any other conduct which similarly creates a likelihood of confusion or of misunderstanding."

224.     Stericycle is a person within the meaning of 6 DEL. CODE § 2531(5).

225.     Stericycle willfully failed to disclose and actively concealed material facts regarding the prices it charged its customers, the reasons for price increases it imposed, and the amounts owed to it for services it performed as described above.  Accordingly, Stericycle engaged in deceptive trade practices, including advertising its Steri-Safe service with the intent not to sell them at the prices it advertised; omitting material facts in describing its services and the prices it would charge; making false and misleading statements of fact regarding the

- 57 -

supposed price reductions it offered to customers who complained about Stericycle's price increases, and otherwise engaging in conduct which created a likelihood of confusion or misunderstanding.

226.  Stericycle's actions as set forth above occurred in the conduct of trade or commerce.

227.  Stericycle's conduct proximately caused injuries to Plaintiffs and the Class.

228.  Plaintiffs seek injunctive relief and, if awarded damages under Delaware common law or Delaware Consumer Fraud Act, treble damages pursuant to 6 DEL. CODE § 2533(c).

**COUNT XI**

**VIOLATIONS OF THE FLORIDA DECEPTIVE AND
UNFAIR TRADE PRACTICES ACT
(FLA. STAT. § 501.201, *et seq.*)**

229.  Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

230.  As amended by the Florida Legislature in 2001, a "person" who has suffered a loss as a result of a violation of the Florida Deceptive and Unfair Trade Practices Act ("FDUTPA") has standing to sue under that statute. *See* FLA. STAT. § 501.211(2). This 2001 amendment replaced the word "consumer" with "person." Plaintiffs and Class members are "persons" within the meaning of the FDUTPA.

231.  As set forth herein, Stericycle engaged in unfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of trade or commerce in violation of the FDUPTA.

232.  Stericycle's conduct caused Plaintiffs and Class members to suffer actual damages.

- 58 -

## COUNT XII

## VIOLATIONS OF THE IDAHO CONSUMER PROTECTION ACT
### (IDAHO CIV. CODE § 480, *et seq.*)

233.    Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

234.    Defendants and Plaintiffs are "persons" under IDAHO CIVIL CODE § 48-602(1).

235.    Defendants engaged in unfair methods and practices in the conduct of its trade or commerce in violation of the Idaho Consumer Protection Act ("ICPA"), IDAHO CIV. CODE § 48-603, including "(9) Advertising goods or services with intent not to sell them as advertised," "(11) Making false or misleading statements of fact concerning the reasons for, existence of, or amounts of price reductions," "(17) Engaging in any act or practice which is otherwise misleading, false, or deceptive to the consumer," or "Engaging in any unconscionable method, act or practice in the conduct of trade or commerce."

236.    As set forth herein, Stericycle engaged in unfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of trade or commerce in violation of the ICPA.  Stericycle willfully failed to disclose and actively concealed material facts regarding the prices it charged its customers, the reasons for price increases it imposed, and the amounts owed to it for services it performed as described above. Accordingly, Stericycle engaged in deceptive trade practices, including advertising its Steri-Safe service with the intent not to sell them at the prices it advertised; omitting material facts in describing its services and the prices it would charge; knowingly making false and misleading statements of fact regarding the supposed price reductions it offered to customers who complained about Stericycle's price increases, and otherwise engaging in conduct which created a likelihood of confusion or misunderstanding.

- 59 -

237.    Stericycle's misleading, false, or deceptive acts or practices were likely to and did in fact deceive reasonable consumers, including Plaintiffs.

238.    As a result of its violations of the ICPA detailed above, Defendant caused actual damage and ascertainable loss to Plaintiffs.

239.    Stericycle's deliberate, widespread and systematic fraud was so egregious and carried out with such willful and conscious disregard of the rights of its customers that its sales conduct would outrage or offend the public conscience, and is therefore an unconscionable method, act or practice under the ICPA as provided in IDAHO CIVIL CODE § 48-603C.

240.    Plaintiffs seek punitive damages against Defendant because its violations were repeated and flagrant, conducted over the course of many years, with knowledge of the illegality of the conduct, and therefore warrants the imposition of punitive damages under IDAHO CIVIL CODE § 48-608(1).

241.    Plaintiffs further seek an order enjoining Defendants' unfair or deceptive acts or practices, punitive damages, costs of Court, attorney's fees under IDAHO CIVIL CODE § 48-608, and any other just and proper relief available under the ICPA.

## COUNT XIII

### VIOLATIONS OF THE MASSACHUSETTS CONSUMER PROTECTION ACT
(MASS. GEN. LAWS CH. 93A, *et seq.*)

242.    Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

243.    Plaintiffs intend to assert a claim under the Massachusetts Consumer Protection Act ("MCPA"), which makes it unlawful to engage in any "[u]nfair methods of competition or deceptive acts or practices in the conduct of any trade or commerce." MASS. GEN. LAWS CH. 93A, § 2(1). Plaintiffs will make a demand in satisfaction of MASS. GEN. LAWS CH. 93A, § 9(3),

- 60 -

and may amend this Complaint to assert claims under the MCPA once the required 30 days have

elapsed.  This paragraph is included for purposes of notice only and is not intended to actually

assert a claim under the MCPA.

## COUNT XIV

### VIOLATIONS OF THE MINNESOTA PREVENTION OF CONSUMER FRAUD ACT
(MINN. STAT. § 325F.68-70)

244.    Plaintiffs reallege and incorporate by reference all paragraphs as though fully set

forth herein.

245.    Plaintiffs, members of the Class and Defendant are each "persons" as defined by

the Minnesota Prevention of Consumer Fraud Act ("MPCFA"), MINN. STAT. § 325F.68(2).  The

medical waste disposal service Stericycle sold to Plaintiffs and the Class are "Merchandise" as

defined by MINN. STAT. § 325F.68(2).

246.    The MPCFA makes unlawful "[t]he act, use, or employment by any person of any

fraud, false pretense, false promise, misrepresentation, misleading statement or deceptive

practice, with the intent that others rely thereon in connection with the sale of any merchandise,

whether or not any person has in fact been misled, deceived, or damaged thereby."  MINN. STAT.

§ 325F.69(1).  The MPCFA further provides that "any person injured by a violation of [the

MPCFA] may bring a civil action and recover damages, together with costs and disbursements,

including costs of investigation and reasonable attorney's fees, and receive other equitable relief

as determined by the court."  MINN. STAT. § 8.31(3a).

247.    Stericycle willfully failed to disclose and actively concealed material facts

regarding the prices it charged its customers, the reasons for price increases it imposed, and the

amounts owed to it for services it performed as described above.  Accordingly, Stericycle

engaged in unlawful trade practices, including advertising its Steri-Safe service with the intent

- 61 -

not to sell them at the prices it advertised; omitting material facts in describing its services and the prices it would charge; and representing that its agreements with its customers conferred or involves rights, remedies, or obligations which they did not confer or involve.  By concealing and omitting material information from Plaintiffs and the Class and by making affirmative misrepresentations as described above, Defendant engaged in deceptive business practices prohibited by the MPCFA.  Stericycle's material omissions and misrepresentations were made with the intent that Plaintiffs and the Class would rely upon them, and Plaintiffs and the Class did in fact rely upon those material omissions and misstatements.

248.    Stericycle's unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers, including Plaintiffs.

249.    Plaintiffs and the Class sustained damages as a result of the Defendant's unlawful acts and are, therefore, entitled to damages and other relief as provided under the MPCFA.

## COUNT XV

### VIOLATIONS OF THE NEBRASKA CONSUMER PROTECTION ACT
(NEB. REV. STAT. § 87-301, *et seq.*)

250.    Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

251.    The Nebraska Consumer Protection Act ("NCPA") prohibits "unfair or deceptive acts or practices in the conduct of any trade or commerce."

252.    "Trade or commerce" means "the sale of assets or services and any commerce directly or indirectly affecting the people of the State of Nebraska."

253.    Defendants engaged in unfair methods and practices in the conduct of its trade or commerce in violation of the NCPA, under which a person commits a violation when it "(9) Advertises goods or services with intent not to sell them as advertised or advertises the price in

- 62 -

any manner calculated or tending to mislead or in any way deceive a person," "(11) Makes false

or misleading statements of fact concerning the reasons for, existence of, or amounts of price

reductions," or "(15) Uses any scheme or device to defraud by means of: (i) Obtaining money or

property by knowingly false or fraudulent pretenses, representations, or promises."

  254. As set forth herein, Stericycle engaged in unlawful deceptive trade practices in the

conduct of trade or commerce in violation of the NCPA. Stericycle willfully failed to disclose

and actively concealed material facts regarding the prices it charged its customers, the reasons

for price increases it imposed, and the amounts owed to it for services it performed as described

above. In addition, Stericycle engaged in other deceptive trade practices, including advertising

its Steri-Safe service with the intent not to sell them at the prices it advertised; disclosing and

advertising its prices to customers in a manner calculated or tending to deceive Stericycle

customers; omitting material facts in describing its services and the prices it would charge;

knowingly making false and misleading statements of fact regarding the supposed price

reductions it offered to customers who complained about Stericycle's price increases, and by

invoicing Plaintiffs and Class members for amounts it knew were not rightfully owed under its

agreements, thereby obtaining money through false and fraudulent representations.

  255. Stericycle's actions as set forth above occurred in the conduct of trade or

commerce.

  256. Stericycle's actions impact the public interest because Plaintiffs were deceived,

misled, and injured in exactly the same way as thousands of other Stericycle customers, and

because the cost of services such as medical waste collection and treatment impacts the cost of

healthcare, and the public interest in maintaining affordable access to health services. All of the

- 63 -

wrongful conduct alleged herein occurred, and continues to occur, in the conduct of Stericycle's business.

257.    Plaintiffs and the Class were injured in their business or property as a result of Defendant's conduct.

258.    Stericycle's conduct proximately caused the injuries to Plaintiffs and the Class, who are entitled to recover actual damages, as well as enhanced damages pursuant to § 59-1609.

## COUNT XVI

## VIOLATIONS OF THE NEW HAMPSHIRE CONSUMER PROTECTION ACT
### (N.H. REV. STAT. § 358-A:1, *et seq.*)

259.    Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

260.    The New Hampshire Consumer Protection Act ("NHCPA") prohibits "any unfair or deceptive act or practice in the conduct of any trade or commerce."

261.     "Trade or commerce" includes "the distribution of any services directly or indirectly affecting the people of this state."

262.    Defendants engaged in unfair methods and practices in the conduct of its trade or commerce in violation of the NHCPA, including the following prohibited conduct:  "(IX) Advertising goods or services with intent not to sell them as advertised," and "(XI) Making false or misleading statements of fact concerning the reasons for, existence of, or amounts of price reductions."

263.    As set forth herein, Stericycle engaged in unlawful deceptive trade practices in the conduct of trade or commerce in violation of the NHCPA.  Stericycle willfully failed to disclose and actively concealed material facts regarding the prices it charged its customers, the reasons for price increases it imposed, and the amounts owed to it for services it performed as described

- 64 -

above.  In addition, Stericycle engaged in other deceptive trade practices, including advertising its Steri-Safe service with the intent not to sell them at the prices it advertised; disclosing and advertising its prices to customers in a manner calculated or tending to deceive Stericycle customers; omitting material facts in describing its services and the prices it would charge; knowingly making false and misleading statements of fact regarding the supposed price reductions it offered to customers who complained about Stericycle's price increases, and by invoicing Plaintiffs and Class members for amounts it knew were not rightfully owed under its agreements.

264.    Stericycle's actions as set forth above occurred in the conduct of trade or commerce, and were committed willfully or knowingly.

265.    Stericycle's conduct proximately caused damage to Plaintiffs and the Class. Plaintiffs and the Class seek the recovery of actual damages, costs and attorney's fees pursuant to N.H. REV. STAT. § 358-A:10-a.

## COUNT XVII

### VIOLATIONS OF THE NEW JERSEY CONSUMER FRAUD ACT
### (N.J. STAT. ANN. § 56-8-19, *et seq.*)

266.    Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

267.    The New Jersey Consumer Fraud Act ("NJCFA") makes unlawful "[t]he act, use or employment by any person of any unconscionable commercial practice, deception, fraud, false pretense, false promise, misrepresentation, or the knowing concealment, suppression or omission of any material fact with the intent that others rely upon such concealment, suppression or omission, in connection with the sale or advertisement of any merchandise or real estate, or with

- 65 -

the subsequent performance of such person as aforesaid, whether or not any person has in fact

been misled, deceived or damaged thereby…" N.J. STAT. ANN. § 56:8-2.

268. Stericycle is a person within the meaning of the NJCFA. N.J. STAT. ANN. § 56:8-1(d).

269. In the course of Stericycle's business, it knowingly failed to disclose and actively concealed material facts regarding the prices it charged its customers, the reasons for price increases it imposed, and the amounts owed to it for services it performed. In addition, Stericycle engaged in other deceptive trade practices, including advertising its Steri-Safe service with the intent not to sell it at the prices it advertised; disclosing and advertising its prices to customers in a manner calculated or tending to deceive Stericycle customers; omitting material facts in describing its services and the prices it would charge; knowingly making false and misleading statements of fact regarding the supposed price reductions it offered to customers who complained about Stericycle's price increases, and by invoicing Plaintiffs and Class members for amounts it knew were not rightfully owed under its agreements, thereby obtaining money through false and fraudulent representations. Stericycle knew or should have known that its conduct violated the NJCFA.

270. Stericycle engaged in an unlawful practice under the NJCFA when it failed to disclose material information concerning its pricing practices and imposition of APIs on fixed-price contracts and the true reasons and justifications for APIs and other fees and surcharges it imposed on customers. Stericycle deliberately withheld the information regarding its true pricing practices and the reasons for price increases to induce customers to enter into a transaction and/or remain Stericycle customers.

271. Stericycle's unlawful practices cause substantial injury to consumers.

- 66 -

272.     Plaintiffs and the Class suffered ascertainable loss of money or property caused by Stericycle's unlawful practices.  Plaintiffs and the Class overpaid for the medical waste disposal services they purchased and did not receive the benefit of their bargain.

273.     Plaintiffs are entitled to recover legal and/or equitable relief, treble damages, and reasonable attorneys' fees pursuant to N.J. STAT. ANN. § 56:8-19.

274.     Pursuant to N.J. STAT. ANN. § 56:8-20, Plaintiffs will mail a copy of this First Amended Consolidated Complaint to New Jersey's Attorney General within ten (10) days of filing it with the Court.

## COUNT XVIII

### VIOLATIONS OF THE NEW MEXICO UNFAIR TRADE PRACTICES ACT
### (N.M. STAT. ANN. § 57-12-1, *et seq.*)

275.     Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

276.     The New Mexico Unfair Trade Practices Act, N.M. STAT. ANN. §§ 57-12-1, *et seq.* ("New Mexico UTPA") makes unlawful any "[u]nfair or deceptive trade practices and unconscionable trade practices in the conduct of any trade or commerce."  N.M. STAT. ANN. § 57:12-3.  Trade or commerce includes the "sale or distribution of any services."  N.M. STAT. ANN. § 57-12-2(C).

277.     Defendants engaged in unfair methods and practices in the conduct of its trade or commerce in violation of the New Mexico UTPA, including the following prohibited conduct: "(11) making false or misleading statements of fact concerning the price of goods or services … or one's own price at a past or future time or the reasons for, existence of or amounts of price reduction" and "(14) using exaggeration, innuendo or ambiguity as to a material fact or failing to

- 67 -

state a material fact if doing so deceives or tends to deceive," and "(15) stating that a transaction involves rights, remedies or obligations that it does not involve."

278.    Stericycle is a person within the meaning of the New Mexico UTPA. N.M. STAT. ANN. § 57:12-2(A).

279.    In the course of Stericycle's business, it knowingly failed to disclose and actively concealed material facts and made false and misleading statements regarding the prices it charged its customers, the reasons for price increases it imposed, and the amounts owed to it for services it performed.  In addition, Stericycle engaged in other unfair or deceptive trade practices, including advertising its Steri-Safe service with the intent not to sell it at the prices advertised; disclosing and advertising its prices to customers in a manner calculated or tending to deceive Stericycle customers; omitting material facts in describing its services and the prices it would charge; knowingly making false and misleading statements of fact regarding the supposed price reductions it offered to customers who complained about Stericycle's price increases, misrepresenting to customers the rights, remedies or obligations of the agreement between them, and invoicing Plaintiffs and Class members for amounts it knew were not rightfully owed under its agreements, thereby obtaining money through false and fraudulent representations.

280.    Stericycle took advantage of the lack of knowledge, ability, experience, and capacity of Plaintiffs and the Class to a grossly unfair degree.  Defendant's actions resulted in a gross disparity between the value received and the price paid by Plaintiffs and the Class. Defendant's actions constitute unconscionable actions under § 57-12-2(E) of the New Mexico UTPA.

281.    Plaintiffs and the Class lost money and sustained damages as a result of the Defendant's unlawful acts and are, therefore, entitled to damages and other relief provided for

- 68 -

under § 57-12-10 of the New Mexico UTPA. Because Defendant's conduct was committed willfully, Plaintiffs and the Class seek treble damages, along with court costs and attorneys' fees.

## COUNT XIX

### VIOLATIONS OF THE NEW YORK GENERAL BUSINESS LAW
(N.Y. GEN. BUS. LAW § 349)

282. Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

283. Stericycle's business acts and practices alleged herein constitute deceptive acts or practices under the New York General Business Law, Deceptive Acts and Practices, N.Y. GEN. BUS. LAW § 349 ("NYGBL").

284. At all relevant times, Plaintiffs and Class members were acting as consumers of Stericycle's waste disposal services. The challenged behavior of Stericycle was consumer-oriented within the meaning of the NYGBL.

285. The practices of Stericycle, as alleged herein, violated the NYGBL for, *inter alia*, one or more of the following reasons:

a. Stericycle engaged in deceptive, unfair and unconscionable commercial practices which did, or tended to, mislead Plaintiffs about facts that could not reasonably be known by them;

b. Stericycle caused Plaintiffs to suffer a probability of confusion and a misunderstanding of legal rights, obligations and/or remedies by and through its conduct;

c. Stericycle failed to reveal material facts to Plaintiffs and the Class members;

d. Stericycle made material representations and statements of fact to Plaintiffs and the Cass members; and

- 69 -

e.     Under all of the circumstances, Stericycle's conduct in employing these unfair and deceptive trade practices was malicious, willful, wanton and outrageous such as to shock the conscience of the community and warrant the imposition of punitive damages.

286.    Stericycle's violations of the NYGBL caused injuries to Plaintiffs and Class members.

## COUNT XX

### VIOLATIONS OF THE NORTH CAROLINA UNFAIR AND DECEPTIVE TRADE PRACTICES ACT
### (N.C. GEN. STAT. § 75-1.1, *et seq.*)

287.    Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

288.    North Carolina's Unfair and Deceptive Trade Practices Act, N.C. GEN. STAT. §§ 75-1.1, *et seq.* ("NCUDTPA"), prohibits a person from engaging in "[u]nfair methods of competition in or affecting commerce, and unfair or deceptive acts or practices in or affecting commerce[.]" The NCUDTPA provides a private right of action for any person injured "by reason of any act or thing done by any other person, firm or corporation in violation of" the NCUDTPA.  N.C. GEN. STAT. § 75-16.

289.    Stericycle's acts and practices complained of herein were performed in the course of its trade or business and thus occurred in or affected "commerce," which includes Stericycle's medical waste disposal services as defined in N.C. GEN. STAT. § 75-1.1(b).

290.    In the course of Stericycle's business, it knowingly failed to disclose and actively concealed material facts and made false and misleading statements regarding the prices it charged its customers, the reasons for price increases it imposed, and the amounts owed to it for services it performed.  In addition, Stericycle engaged in other unfair or deceptive trade practices, including advertising its Steri-Safe service with the intent not to sell it at the prices

- 70 -

advertised; disclosing and advertising its prices to customers in a manner calculated or tending to deceive Stericycle customers; omitting material facts in describing its services and the prices it would charge; knowingly making false and misleading statements of fact regarding the supposed price reductions it offered to customers who complained about Stericycle's price increases, misrepresenting to customers the rights, remedies or obligations of the agreement between them, and invoicing Plaintiffs and Class members for amounts it knew were not rightfully owed under its agreements, thereby obtaining money through false and fraudulent representations.

291.    Plaintiffs and members of the Class relied upon Stericycle's false and misleading representations and omissions in deciding whether to enter into contracts with Stericycle or continue using Stericycle for medical waste collection and removal.

292.    Stericycle's conduct proximately caused injuries to Plaintiffs and the Class.

293.    Plaintiffs and the other Class members were injured as a result of Stericycle's conduct in that Plaintiffs and the other Class members overpaid for the medical waste disposal services they purchased and did not receive the benefit of their bargain.  These injuries are the direct and natural consequence of Stericycle's misrepresentations and omissions.

294.    Plaintiffs, individually and on behalf of the other Class members, seek treble damages pursuant to N.C. GEN. STAT. § 75-16, and an award of attorneys' fees pursuant to N.C. GEN. STAT. § 75-16.1.

## COUNT XXI

## VIOLATIONS OF THE NORTH DAKOTA CONSUMER FRAUD ACT
### (N.D. CENT. CODE § 51-15-01, *et seq.*)

295.    Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

296.    North Dakota's Consumer Fraud Act, N.D. CENT. CODE §§ 51-15-01, *et seq.*
("NDCFA"), prohibits a person from engaging in "any deceptive act or practice, fraud, false
pretense, false promise, or misrepresentation, with the intent that others rely thereon in
connection with the sale or advertisement of any merchandise, whether or not any person has in
fact been misled, deceived, or damaged thereby." N.D. CENT. CODE § 51-15-02. Stericycle's
sale of medical waste collection and disposal services constitutes "merchandise" as defined by
the NDCFA. N.D. CENT. CODE § 51-15-02(3).

297.    The NDCFA provides a private right of action against any person who has
acquired money or property "by means of any practice declared to be unlawful" by the NDCFA.
N.D. CENT. CODE § 51-15-09.

298.    In the course of Stericycle's business, it knowingly failed to disclose and actively
concealed material facts and made false and misleading statements regarding the prices it
charged its customers, the reasons for price increases it imposed, and the amounts owed to it for
services it performed. In addition, Stericycle engaged in other unfair or deceptive trade
practices, including advertising its Steri-Safe service with the intent not to sell it at the prices
advertised; disclosing and advertising its prices to customers in a manner calculated or tending to
deceive Stericycle customers; omitting material facts in describing its services and the prices it
would charge; knowingly making false and misleading statements of fact regarding the supposed
price reductions it offered to customers who complained about Stericycle's price increases,
misrepresenting to customers the rights, remedies or obligations of the agreement between them,
and invoicing Plaintiffs and Class members for amounts it knew were not rightfully owed under
its agreements, thereby obtaining money through false and fraudulent representations.

299.     Plaintiffs and members of the Class relied upon Stericycle's false and misleading representations and omissions in deciding whether to enter into contracts with Stericycle or continue using Stericycle for medical waste collection and removal.

300.     Stericycle's conduct proximately caused injuries to Plaintiffs and the Class.

301.     Plaintiffs and the other Class members suffered a loss of money or property and were injured as a result of Stericycle's conduct in that Plaintiffs and the other Class members overpaid for the medical waste disposal services they purchased and did not receive the benefit of their bargain.  These injuries are the direct and natural consequence of Stericycle's misrepresentations and omissions.

302.     Stericycle knowingly committed the conduct described above, and thus, under N.D. CENT. CODE § 51-15-09, is liable to Plaintiffs and the Class for treble damages, as well as attorneys' fees, costs, and disbursements.

## COUNT XXII

### VIOLATIONS OF THE OKLAHOMA CONSUMER PROTECTION ACT
### (OKLA. STAT. TIT. 15 § 751, *et seq.*)

303.     Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

304.     Oklahoma's Consumer Protection Act, OKLA. STAT. TIT. 15 § 751, *et seq.* ("Oklahoma CPA"), makes it unlawful to commit unfair or deceptive trade practices.  A deceptive trade practice "means a misrepresentation, omission or other practice that has deceived or could reasonably be expected to deceive or mislead a person to the detriment of that person. Such a practice may occur before, during or after a consumer transaction is entered into and may be written or oral."  OKLA. STAT. TIT. 15 § 752(13).  An unfair trade practice "means any practice which offends established public policy or if the practice is immoral, unethical,

- 73 -

oppressive, unscrupulous or substantially injurious to consumers." OKLA. STAT. TIT. 15 § 752(14).

305.     In the course of Stericycle's business, it knowingly failed to disclose and actively concealed material facts and made false and misleading statements regarding the prices it charged its customers, the reasons for price increases it imposed, and the amounts owed to it for services it performed.  In addition, Stericycle engaged in other unfair or deceptive trade practices, including advertising its Steri-Safe service with the intent not to sell it at the prices advertised; disclosing and advertising its prices to customers in a manner calculated or tending to deceive Stericycle customers; omitting material facts in describing its services and the prices it would charge; knowingly making false and misleading statements of fact regarding the supposed price reductions it offered to customers who complained about Stericycle's price increases, misrepresenting to customers the rights, remedies or obligations of the agreement between them, and invoicing Plaintiffs and Class members for amounts it knew were not rightfully owed under its agreements, thereby obtaining money through false and fraudulent representations.

306.     Stericycle's misrepresentations could reasonably be expected to deceive or mislead a person to their detriment, and actually did deceive Plaintiffs and members of the Class.

307.     Stericycle's conduct described above offends established public policy and is immoral, unethical, oppressive, unscrupulous and substantially injurious to consumers and affect the public interest because Plaintiffs and members of the Class were injured in the same way as thousands of others through Stericycle's generalized course of deception.

308.     Stericycle's conduct proximately caused injuries to Plaintiffs and the Class. Plaintiffs and the other Class members suffered a loss of money or property and were injured as a result of Stericycle's conduct in that Plaintiffs and the other Class members overpaid for the

- 74 -

medical waste disposal services they purchased and did not receive the benefit of their bargain. These injuries are the direct and natural consequence of Stericycle's misrepresentations and omissions.

309.    Stericycle is liable to Plaintiffs and the Class for damages in amounts to be proven at trial, including attorneys' fees, costs, and treble damages.

## COUNT XXIII

### VIOLATIONS OF THE OKLAHOMA CONSUMER DECEPTIVE TRADE PRACTICES ACT
### (OKLA. STAT. TIT. 78 § 51-55, *et seq.*)

310.    Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth

311.    Oklahoma's Deceptive Trade Practices Act, OKLA. STAT. TIT. 78 § 51-55, *et seq.* ("Oklahoma DTPA"), makes it unlawful to engage deceptive trade practices in the course of a business, vocation or occupation.  A person commits a deceptive trade practice when, he "11. Makes false or misleading statements of fact concerning the reasons for, existence of, or amounts of price reductions."  OKLA. STAT. TIT. 78 § 53.

312.    In the course of Stericycle's business, it knowingly failed to disclose and actively concealed material facts and made false and misleading statements regarding the prices it charged its customers, the reasons for price increases it imposed, and the amounts owed to it for services it performed.  In addition, Stericycle engaged in other unfair or deceptive trade practices, including advertising its Steri-Safe service with the intent not to sell it at the prices advertised; disclosing and advertising its prices to customers in a manner calculated or tending to deceive Stericycle customers; omitting material facts in describing its services and the prices it would charge; knowingly making false and misleading statements of fact regarding the supposed price reductions it offered to customers who complained about Stericycle's price increases,

- 75 -

misrepresenting to customers the rights, remedies or obligations of the agreement between them, and invoicing Plaintiffs and Class members for amounts it knew were not rightfully owed under its agreements, thereby obtaining money through false and fraudulent representations.

313.     Stericycle's actions as set forth above occurred in the conduct of trade or commerce, and constitute deceptive trade practices under the Oklahoma DTPA.

314.     Stericycle's actions impact the public interest because Plaintiffs were injured in exactly the same way as thousands of others purchasing Stericycle's services as a result of Stericycle's generalized course of deception.

315.     Plaintiffs and the Class were injured as a result of Stericycle's conduct, and suffered actual monetary loss.  Plaintiffs overpaid for the medial waste collection and disposal services and did not receive the benefit of their bargain.

316.     Plaintiffs seek an award of actual damages, attorney's fees and costs and permitted by the Oklahoma DTPA.

**COUNT XXIV**

**VIOLATIONS OF THE SOUTH CAROLINA UNFAIR TRADE PRACTICES ACT**
**(S.C. CODE ANN. § 39-5-10, *et seq.*)**

317.     Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

318.     The South Carolina Unfair Trade Practices Act ("SCUTP") prohibits "Unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce."  S.C. CODE ANN. § 39-5-20(a).  Stericycle is a person within the meaning of S.C. CODE ANN. § 39-5-10(a).

319.     Trade or commerce as defined by the SCUTP includes the "sale or distribution of any services" and includes "any trade or commerce directly or indirectly affecting the people" of

- 76 -

South Carolina. S.C. CODE ANN. § 39-5-10(b). Stericycle's the medical waste collection and disposal services at issue in this case are "services" under the SCUTP and affect the people of South Carolina directly and indirectly.

320.    In the course of Stericycle's business, it knowingly and willfully failed to disclose and actively concealed material facts and made false and misleading statements regarding the prices it charged its customers, the reasons for price increases it imposed, and the amounts owed to it for services it performed. In addition, Stericycle engaged in other unfair or deceptive trade practices, including advertising its Steri-Safe service with the intent not to sell it at the prices advertised; disclosing and advertising its prices to customers in a manner calculated or tending to deceive Stericycle customers; omitting material facts in describing its services and the prices it would charge; knowingly making false and misleading statements of fact regarding the supposed price reductions it offered to customers who complained about Stericycle's price increases; misrepresenting to customers the rights, remedies or obligations of the agreement between them, and invoicing Plaintiffs and Class members for amounts it knew were not rightfully owed under its agreements, thereby obtaining money through false and fraudulent representations.

321.    Stericycle's actions as set forth above occurred in the conduct of trade or commerce, and constitute deceptive trade practices under the SCUTP.

322.    Plaintiffs and the Class were injured as a result of Stericycle's conduct, and suffered ascertainable monetary loss. Plaintiffs overpaid for the medial waste collection and disposal services and did not receive the benefit of their bargain.

323.    Plaintiffs seek an award of actual damages, treble damages, attorney's fees and costs and permitted by the SCUTP. S.C. CODE ANN. § 39-5-140.

## COUNT XXV

### VIOLATIONS OF THE SOUTH DAKOTA DECEPTIVE TRADE PRACTICES AND CONSUMER PROTECTION ACT (S.D. CODE ANN. § 39-5-10, *et seq.*

324.    Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

325.    The South Dakota Deceptive Trade Practices and Consumer Protection Act ("SDCPA") makes it an unlawful, deceptive act or practice to "[k]nowingly and intentionally act, use, or employ any deceptive act or practice, fraud, false pretense, false promises, or misrepresentation or to conceal, suppress, or omit any material fact in connection with the sale or advertisement of any merchandise, regardless of whether any person has in fact been misled, deceived, or damaged thereby."  S.D. CODIFIED LAWS § 37-24-6.

326.    Stericycle's medical waste collection and disposal services at issue in this case are "services" under the SDCPA.  S.D. CODIFIED LAWS § 37-24-1.

327.    In the course of Stericycle's business, it knowingly and intentionally failed to disclose and actively concealed material facts and made false and misleading statements regarding the prices it charged its customers, the reasons for price increases it imposed, and the amounts owed to it for services it performed.  In addition, Stericycle engaged in other unfair or deceptive trade practices, including advertising its Steri-Safe service with the intent not to sell it at the prices advertised; disclosing and advertising its prices to customers in a manner calculated or tending to deceive Stericycle customers; omitting material facts in describing its services and the prices it would charge; knowingly making false and misleading statements of fact regarding the supposed price reductions it offered to customers who complained about Stericycle's price increases, misrepresenting to customers the rights, remedies or obligations of the agreement between them, and invoicing Plaintiffs and Class members for amounts it knew were not

- 78 -

rightfully owed under its agreements, thereby obtaining money through false and fraudulent representations.

328.    Stericycle's actions as set forth above occurred in the conduct of trade or commerce, and constitute deceptive trade practices under the SDCPA.

329.    Plaintiffs and the Class were injured as a result of Stericycle's conduct, and suffered ascertainable monetary loss.  Plaintiffs overpaid for the medial waste collection and disposal services and did not receive the benefit of their bargain.

330.    Plaintiffs seek an award of actual damages, attorney's fees and costs as permitted by the SDCPA.  S.C. CODE ANN. § 39-5-140.

## COUNT XXVI

## VIOLATIONS OF THE TENNESSEE CONSUMER PROTECTION ACT
(TENN. CODE ANN. § 47-18-101, *et seq.*)

331.    Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

332.    The Tennessee Consumer Protection Act ("TCPA") makes unlawful to commit unfair or deceptive acts or practices "affecting the conduct of any trade or conduct.  TENN. CODE. ANN. § 47-18-104(b).  Unfair or deceptive practices under the TCPA include "(9) Advertising goods or services with intent not to sell them as advertised," and "(11) Making false or misleading statements of fact concerning the reasons for, existence of, or amounts of price reductions."  TENN. CODE ANN. § 47-18-104(b).

333.    Stericycle's the medical waste collection and disposal services at issue constitute a "service" under the TCPA.  TENN. CODE ANN. § 47-18-103(18).

334.    In the course of Stericycle's business, it knowingly, willfully and intentionally failed to disclose and actively concealed material facts and made false and misleading statements

- 79 -

regarding the prices it charged its customers, the reasons for price increases it imposed, and the amounts owed to it for services it performed. In addition, Stericycle engaged in other unfair or deceptive trade practices, including advertising its Steri-Safe service with the intent not to sell it at the prices advertised; disclosing and advertising its prices to customers in a manner calculated or tending to deceive Stericycle customers; omitting material facts in describing its services and the prices it would charge; knowingly making false and misleading statements of fact regarding the supposed price reductions it offered to customers who complained about Stericycle's price increases, misrepresenting to customers the rights, remedies or obligations of the agreement between them, and invoicing Plaintiffs and Class members for amounts it knew were not rightfully owed under its agreements, thereby obtaining money through false and fraudulent representations.

335.     Stericycle's actions as set forth above occurred in the conduct of trade or commerce, and constitute unfair or deceptive trade practices under the TCPA.

336.     Plaintiffs and the Class were injured as a result of Stericycle's conduct, and suffered ascertainable monetary loss. Plaintiffs overpaid for the medial waste collection and disposal services and did not receive the benefit of their bargain.

337.     Plaintiffs seek an award of actual damages, treble damages, attorney's fees and costs as permitted by the TCPA. TENN. CODE ANN. § 47-18-109.

## COUNT XXVII

## VIOLATIONS OF THE TEXAS DECEPTIVE TRADE PRACTICES ACT
### (TEX. BUS. & COM. CODE § 17.41, *et seq.*)

338.     Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

- 80 -

339.     Plaintiffs intend to assert a claim under the Texas Deceptive Trade Practices Act ("TDTPA"), which makes it unlawful to commit "[f]alse, misleading, or deceptive acts or practices in the conduct of any trade or commerce." TEX. BUS. & COM. CODE § 17.46.  Plaintiffs will make a demand in satisfaction of TEX. BUS. & COM. CODE § 17.45(2), and may amend this Complaint to assert claims under the TDTPA once the required 60 days have elapsed.  This paragraph is included for purposes of notice only and is not intended to actually assert a claim under the TDTPA.

## COUNT XXVIII

### VIOLATIONS OF THE VERMONT CONSUMER FRAUD ACT
### (VT. STAT. ANN. § 2451, *et seq.*)

340.     Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

341.     The Vermont Consumer Fraud Act ("VCPA") makes unlawful to commit "Unfair methods of competition in commerce, and unfair or deceptive acts or practices in commerce." VT. STAT. ANN. § 2453(a).  The VCPA provides a private right of action for "[a]ny consumer who contracts for goods or services in reliance upon false or fraudulent representations or practices … or who sustains damages or injury as a result of any false or fraudulent representations or practices" prohibited by the VCPA.  VT. STAT. ANN. § 2461(b).

342.     Plaintiffs are each "consumers" as defined by VT. STAT. ANN. § 2451a(a). Stericycle's medical waste collection and disposal services  are "services" under VT. STAT. ANN. § 2451a(b).

343.     In the course of Stericycle's business, it knowingly and intentionally failed to disclose and actively concealed material facts and made false and misleading statements regarding the prices it charged its customers, the reasons for price increases it imposed, and the

- 81 -

amounts owed to it for services it performed.  In addition, Stericycle engaged in other unfair or deceptive trade practices, including advertising its Steri-Safe service with the intent not to sell it at the prices advertised; disclosing and advertising its prices to customers in a manner calculated or tending to deceive Stericycle customers; omitting material facts in describing its services and the prices it would charge; knowingly making false and misleading statements of fact regarding the supposed price reductions it offered to customers who complained about Stericycle's price increases, misrepresenting to customers the rights, remedies or obligations of the agreement between them, and invoicing Plaintiffs and Class members for amounts it knew were not rightfully owed under its agreements, thereby obtaining money through false and fraudulent representations.

344.    Stericycle's actions as set forth above occurred in the conduct of trade or commerce, and constitute unfair or deceptive trade practices under the WCPA.

345.    Plaintiffs and the Class relied upon and were deceived by Stericycle's unfair and deceptive misrepresentations of material fact in deciding to enter into contracts or continue doing business with Stericycle.

346.    Plaintiffs and the Class were injured as a result of Stericycle's conduct, and suffered ascertainable monetary loss.  Plaintiffs overpaid for the medial waste collection and disposal services and did not receive the benefit of their bargain.

347.    Plaintiffs seek an award of actual damages, treble damages, attorney's fees and costs as permitted by the VCPA.  VT. STAT. ANN. § 2461(b).

### PRAYER FOR RELIEF

WHEREFORE, Plaintiffs and Class members request that the Court enter an order or judgment against Defendant including the following:

A.      Declaring that this action may be maintained as a class action pursuant to Federal Rules of Civil Procedure, Rule 23, and for an order certifying this case as a class action and appointing Plaintiffs as Class representatives;

B.      Declaring that Defendant's practice of charging Plaintiffs and the Class with automated price increases breached Defendant's contracts with Plaintiffs and the Class and was wrongful and unfair;

C.      Declaring that, because of Defendant's breach of contract, Defendant's agreements with Plaintiffs and the Class are void and unenforceable;

D.      Restitution of all automated price increases paid to Defendant by Plaintiffs and the Class, in an amount to be determined at trial;

E.      Declaring that Defendant misappropriated and converted monies rightfully belonging to Plaintiffs and the Class;

F.      Disgorgement of the ill-gotten gains derived by Defendant from its misconduct;

G.      Actual damages in an amount according to proof;

H.      Punitive damages;

I.      Compensatory damages caused by Defendant's unfair, wrongful, or deceptive practices; along with exemplary damages to Plaintiffs and each Class member for each violation;

J.      A permanent injunction requiring Defendant to cease charging automated price increases or to modify its standard form contracts to inform all customers that it imposes, on a cycle to be determined at trial, an automated price increase not connected to operational changes implemented to comply with changes in law or specific increases in costs;

K.      Pre-judgment and post-judgment interest at the maximum rate permitted by applicable law;

- 83 -

L.     An order awarding Plaintiffs and the Class their attorney's fees and costs and expenses incurred in connection with this action; and

M.     Such other and further relief as the Court deems just and proper.

**DEMAND FOR JURY TRIAL**

Plaintiffs hereby demand a trial by jury, pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, of all issues so triable.


DATED: January 29, 2016                     HAGENS BERMAN SOBOL SHAPIRO LLP


                                            By:    */s/ Steve W. Berman*
                                                   Steve W. Berman
                                            Jeffrey T. Sprung
                                            Garth Wojtanowicz
                                            HAGENS BERMAN SOBOL SHAPIRO LLP
                                            1918 Eighth Ave., Suite 3300
                                            Seattle, WA 98101
                                            Telephone:  (206) 623-7292
                                            Facsimile:  (206) 623-0594
                                            E-mail: steve@hbsslaw.com
                                            E-mail:  jeffs@hbsslaw.com
                                            E-mail:  garthw@hbsslaw.com

                                            Elizabeth A. Fegan
                                            HAGENS BERMAN SOBOL SHAPIRO LLP
                                            1144 W. Lake Street, Suite 400
                                            Oak Park, IL 60301
                                            Telephone:  (708) 628-4949
                                            Facsimile:  (708) 628-4950
                                            E-mail:  beth@hbsslaw.com

                                            *Interim Lead Class Counsel*

Joseph G. Sauder
Matthew D. Schelkopf
Benjamin F. Johns
**CHIMICLES & TIKELLIS LLP**
One Haverford Centre
361 West Lancaster Avenue
Haverford, PA 19041
Telephone:  (610) 642-8500
Facsimile:  (610) 649-3633
E-mail:  JGS@chimicles.com;
         MDS@chimicles.com;
         BFJ@chimicles.com

*Attorneys for Plaintiffs and the Proposed Class*

- 85 -

## <u>CERTIFICATE OF FILING AND SERVICE</u>

I hereby certify that on this 8th day of March, 2016, a true and correct copy of the

foregoing was filed with the Clerk of Court using the CM/ECF system, which will send

notification of such filing to all counsel of record.


          */s/ Steve W. Berman*
          Steve W. Berman

010362-11 849533 V1