**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **IN RE: STERICYCLE, INC., STERI-SAFE** | ) | |
| **CONTRACT LITIGATION** | ) | Case No. 13 C 5795 |
| | ) | MDL No. 2455 |
| | ) | |
| | ) | |

## <u>MEMORANDUM OPINION AND ORDER</u>

Several facilities have brought actions around the country alleging fraudulent behavior by defendant Stericycle, Inc. ("Stericycle") in connection with their contracts for medical waste disposal. All of those actions have come to this Court's calendar under the auspices of the Panel on Multidistrict Litigation ("MDL Panel"), and a consolidated Complaint has been filed by the interim class counsel under the 13 C 5795 case number shown in the caption.[1] In that Complaint plaintiffs seek an order certifying the action to be maintained as a class action, together with relief comprising restitution, compensatory damages, punitive damages, attorneys' fees, costs of the suit, pre- and post-judgment interest and any other relief that this Court may deem necessary or proper. Plaintiffs seek certification of two classes, a "Damages Class" and an "Injunctive Relief Class," differing solely on the type of relief sought.

This memorandum opinion and order will deal primarily, though not exclusively, with the class certification issue. In supporting their argument for class certification plaintiffs have relied in substantial part on the opinions of the highly qualified Patrick Kilbourne ("Kilbourne") -- more on the subject of his qualifications later. In response Stericycle has asked that this Court

---

[1] As is typical in MDL cases, since then the MDL Panel has transferred a number of tagalong cases from other districts to this Court's calendar to be dealt with under the same judicial umbrella.

strike Kilbourne's testimony as unqualified witness testimony, looking in material part to the testimony of witness Jeremy Boiles ("Boiles"). Unsurprisingly plaintiffs respond by asking that this Court strike Boiles' testimony as inadmissible opinion witness testimony. Because the admissibility of the two witnesses' testimony bears heavily on the question of class certification, this opinion will deal first with the motions to strike Kilbourne and Boiles as witnesses and will then conclude with a class certification decision.

## **Factual Background**

Stericycle is a large medical waste disposal company that provides medical waste collection and disposal services for medical clinics, veterinary clinics, medical labs, municipal jails and other businesses that generate regulated medical waste across the country (Complaint ¶ 3). Seven such businesses initiated this action against Stericycle on behalf of hundreds of thousands of its customers charging fraudulent conduct by Stericycle. Specifically these plaintiffs claim breaches of contract, breaches of the covenant of good faith, unjust enrichment and violations of consumer fraud and uniform deceptive trade practices acts under Illinois law (as well as under several other state laws). Plaintiffs claim that Stericycle violated consumer contracts by using an "automated price increase" ("API") to increase charges arbitrarily to "small-quantity" customers[2] without any notice or explanation. Plaintiffs also claim that Stericycle charged them for several "Undisclosed Fees" that were hidden increases buried in invoices. Kilbourne calculated damages for the class members at $608 million, comprising $481 million for APIs and $146 million for surcharges, less a $19 million reduction related to

---

[2] They claim that Stericycle focused on small-quantity customers because larger and more sophisticated companies (as well as government customers) were harder to take advantage of, especially in light of rulings by several governmental authorities that the APIs were improper.

credits (P. Class Cert. Mem. 14). Stericycle admits that it has employed APIs and has charged

other extra fees, and it has acknowledged that at least some of the contracts with plaintiffs forbid

APIs without notice and justification, but it argues that class certification is inappropriate

because of the wide variance in contract language and client treatment.

To support class certification plaintiffs assert that Stericycle's misconduct amounts to a

common nucleus of operative facts vis-a-vis the class members. They claim (1) that each class

member was invoiced for an API that was neither calculated using dollar amounts of costs

incurred nor authorized by contract, (2) that Stericycle engaged in a common scheme and

practice of offering false and misleading information to induce customers to enter into contracts

and (3) that Stericycle then engaged in further fraudulent conduct to conceal price increases with

false and misleading information as well as illusory price reductions. In calculating the damages

on both a class-wide and an individual-class-member basis, plaintiffs hired Kilbourne to submit a

report based on Stericycle's own data.

### Opinion Witness Qualification Standards

Plaintiffs offer Kilbourne's opinion testimony pursuant to Fed. R. Evid. ("Rule") 702.

For his testimony to be admissible under that Rule it must satisfy the two-part test first set out in

Daubert v. Merrell Dow Pharm., Inc., 509 U.S. 579 (1993) and later extended to fields of

nonscientific expertise in Kumho Tire Co. v. Carmichael, 526 U.S. 137 (1999). As reflected

both in Kumho and in the essentially contemporaneous amendment to Rule 702 with its

accompanying Committee Note,[3] the Supreme Court eliminated any then-existing question as to

---

[3] As a then member of the Judicial Conference's Advisory Committee on the Rules of
Evidence, this Court chaired the subcommittee in charge of drafting the proposed amendments to
(continued)

whether the district courts' gatekeeping function enunciation applied to all expert testimony, not just testimony based on science.

In brief, that previously-debated question was answered with an unconditional "yes." And that made it irrelevant which of the various sources of expertise listed in Rule 702 informed a designated expert's opinions, although the standards for testing the opinion may differ. For example, on the one hand most disciplines do not implicate peer review, which Daubert, 509 U.S. at 593 had specified as one relevant standard in the area of "scientific" knowledge, while on the other hand aspects of the scientific method may well be employed (or may indeed be required) to reach valid opinions in fields not labeled as demanding "scientific" knowledge.

What remains as the common core for any Rule 702 opinion under Daubert-Kumho is that the opinion be both reliable and relevant (Daubert, 509 U.S. at 590-91, 597; Kumho, 526 U.S. at 547). And whatever pigeonhole Kilbourne might be considered as occupying for purposes of various aspects of his proffered opinion, this opinion must of course necessarily look to those dual requirements. But because Stericycle's motion to exclude challenges the admissibility of Kilbourne's opinions solely on reliability grounds, this opinion needs to discuss

_____

(footnote continued)

Rules 701, 702 and 703 and the Committee Note to those amendments. On that score the principal draftsman was the truly outstanding reporter to the Committee, Fordham Law School Professor Daniel Capra (talk about expert!), while this Court had the privilege of working with him most closely in that drafting task. In an instance of particular serendipity, the resulting work product had been approved by the Advisory Committee and the Judicial Conference's Standing Committee and was out for public comment just at the time when Kumho came before the Supreme Court -- and the Supreme Court then cited the Committee Note approvingly in the course of its opinion (526 U.S. at 156-57). As a result the Committee Note was in turn revised to reflect the Kumho decision, and the final product then cleared the Standing Committee, the Judicial Conference and the Supreme Court so as to become effective on December 1, 2000. And as a parenthetical matter of personal pride, this Court was honored to be named as the Chairman of the Advisory Committee during the course of those events.

only that branch of the analysis. As to that reliability prong our Court of Appeals uses two evaluative criteria: "whether the expert is qualified in the relevant field and whether the methodology underlying the expert's conclusions is reliable" (<u>Masters v. Hesston Corp.</u>, 291 F.3d 985, 991 (7th Cir. 2002)).

Most challenges to expert qualifications come up in the context of a trial in motions in limine. Litigants must surmount a much higher bar to disqualify a witness at the stage of class certification -- as <u>In re Visa Check/MasterMoney Antitrust Litig.</u>, 280 F.3d 124, 135 (2d Cir. 2001) teaches:

> The question for the district court at the class certification stage is whether plaintiffs' expert evidence is sufficient to demonstrate common questions of fact warranting certification of the proposed class, not whether the evidence will ultimately be persuasive.

And to inform its decision on class certification this Court must of course decide the appropriate relative weight to afford opinion testimony -- on that score, as <u>In re Hydrogen Peroxide Antitrust Litig.</u>, 552 F.3d 305, 323 (3d Cir. 2009) has put it:

> Weighing conflicting expert testimony at the certification stage is not only permissible; it may be integral to the rigorous analysis Rule 23 demands.

As a caveat, however, it is worth noting that even though that weight is clearly relevant for the class certification decision, it will not necessarily dictate how much weight the same testimony is to be given at later stages of the proceedings (<u>id.</u> at 324).

## Kilbourne's Qualifications

As for Kilbourne's qualifications, Rule 702 permits an expert to be qualified through "knowledge, skill, experience, training or education." That proposition is really a two-sided coin: Abstract academic credentials (no matter how impressive) should not be overvalued if not

apropos to the zone of expertise involved, while at the same time relevant practical experience should not be undervalued if pertinent (<u>Smith v. Ford Motor Co.</u>, 215 F.3d 713, 718 (7th Cir. 2000)).

Kilbourne's resume provides a snapshot of some of his relevant qualifications. He is the managing director at a leading global expert services and consulting firm, with over 22 years of experience in public accounting and consulting. Among his credentials in those fields, he is a certified public and management accountant (CPA and CMA), a fraud examiner (CFE) and a chartered global management accountant (CGMA), and he is also certified in financial forensics (CFF) and accredited in business valuation (ABV) by the American Institute of Certified Public Accountants ("AICPA"), all relevant qualifications for this analysis.

Apart from that impressive alphabet soup array, his educational credentials also cannot be questioned, with a masters of accountancy degree from Brigham Young and an MBA from the University of Pennsylvania Wharton School of Business. In practical terms he has much experience conducting forensic accounting investigations and financial analyses, and there is no doubt that he is fully qualified to provide a professional opinion on this matter.

But the basic determination that Kilbourne is highly qualified to give an expert opinion here is not enough: For such an opinion to be admissible it must also satisfy the independent requirement of reliability based on the methodology used to reach a witness' conclusions (<u>Bourelle v. Crown Equip. Corp.</u>, 220 F.3d 532, 537 n.11 (7th Cir. 2000)). Because the accreditation of Kilbourne's conclusions poses a factual issue to be considered at trial, the <u>Daubert</u>-<u>Kumho</u> assessment of his opinions' reliability must focus exclusively on that methodology and not on his ultimate conclusions (<u>Chapman v. Maytag Corp.</u>, 297 F.3d 682, 687

(7th Cir. 2002); Smith, 215 F.3d at 718). And to that end the most significant reliability factor is whether a particular proposed expert (whether or not classified as a "scientist" as such) has used the scientific method to arrive at his or her conclusions and opinions (Chapman, 297 F.3d at 688).

Kilbourne cites reliable methods for conducting his analysis and repeatedly cites to Stericycle documents. But this Court would shirk its gatekeeper role if it were to accept his conclusory declaration without examining whether Kilbourne's actions really comport with the standard of reliability envisioned by the scientific method requirement (see Kumho, 526 U.S. at 141; Smith, 215 F.3d at 719).

After analyzing Stericycle's computerized financial data, Kilbourne concluded that reliable empirical methods, common to the class, existed to identify Stericycle customers who were charged APIs during the class period. In that respect he identified 256,405 customers as class members subjected to a total of 1,945,530 price changes, among which changes 87.6% were identified by Stericycle as APIs. Kilbourne used his accounting experience to compare the price increases with cost increases on Stericycle's end and found that they were not correlated. For that purpose he used detailed statistical analyses in conducting his calculations on both how much each customer was paying and how much Stericycle profited over the years.

In its arguments challenging Kilbourne's proposed testimony, Stericycle simply ignores all of Kilbourne's qualifications and experience -- a wholly understandable silence, for there is certainly nothing to attack on that front. Instead it seeks to focus on his math itself, pointing out several claimed flaws. To that end Stericycle has criticized Kilbourne for not reviewing every original contract, for making assumptions about the presence and prohibitions of APIs and for

lacking a sufficient factual basis for essential assumptions under <u>Kumho</u>. Stericycle also went on to argue that there is no way in its SteriWorks system to track historical contracts and that the contracts have numerous differences, undermining many of Kilbourne's assumptions.

Stericycle's contentions rely largely on attacking the data that Kilbourne used and the assumptions that he made, while barely criticizing the actual method and calculations that he used (more typical challenges to an opinion witness at this stage). In fact, many of the arguments emanating from Stericycle sound more like challenges related to class certification or to the merits of the case than <u>Daubert</u>-<u>Kumho</u> arguments. In the few places where Kilbourne's methodologies have been questioned, he thoroughly addressed them in his later testimony.

In sum, it is a nearly impossible hill for Stericycle to climb in its urging that this Court should exclude Kilbourne's testimony -- after all, that contention flies in the face of his having relied completely on Stericycle's own database and his having used methodologies accepted as reliable by Stericycle. Its motion to exclude his testimony must therefore be denied. That rejection does not, however, preclude Stericycle from re-raising possible flaws with Kilbourne's conclusions when it comes to weighing his testimony in the context of the class certification question (<u>In re Hydrogen Peroxide Antitrust Litig.</u>, 552 F.3d at 323).

### Boiles' Statement

In contrast to the just-analyzed disagreement over whether Kilbourne was qualified to testify as an opinion witness, no such disagreement exists as to Boiles, for his qualifications were never presented for opinion witness classification. Instead, the core of the litigants' dispute as to the Boiles statement is centered on whether it is improper opinion testimony (as plaintiffs contend) or whether it is acceptable lay testimony (as Stericycle contends). On that score

plaintiffs advance a near barrage of arguments, urging that the Boiles statement, which was submitted in the reply memorandum seeking the dismissal of Kilbourne as a witness, is more than an average random adult could provide, is improper rebuttal evidence not addressing new arguments from the plaintiffs' responsive memorandum defending Kilbourne's testimony and, moreover, that it contradicts other Stericycle witnesses, lacks foundation and is rife with hearsay.

Stericycle correctly counters by pointing out that a lay witness may testify under Rule 701 both as to relevant facts (like any other witness) and also as to opinions reasonably linked to those facts by "his or her range of generalized knowledge, experience, and perception" (United States v. Espino, 317 F.3d 788, 797 (8h Cir. 2003)). In that respect the Boiles testimony manages to avoid any opinions based on scientific, technical or other specialized knowledge that would require opinion witness qualification. As explained in the excellent extended discussion in Federal Rules of Evidence Manual at 701-12 through 701-22 (10th ed. 2011),[4] lay person opinions may be given if they result from "a process of reasoning familiar in everyday life." Due to his position as Vice President of IT Application and Delivery Maintenance, Boiles directly observed the phenomena he discusses. Knowing the contents of a system that he worked on did not "result[ ] from "a process of reasoning which can be mastered only by specialists in the field"

---

[4] In this Court's judgment that treatise is by all odds the best work available to anyone seeking to understand, and seeking to understand the reasons underpinning, the Federal Rules of Evidence. It is the work of a trilogy of truly expert authors ("editors" would be an inadequate label): Professor Dan Capra, already referred to in n.3, George Washington University Law School Professor Steve Saltzburg, who was also this Court's valued colleague during its tenure on the Advisory Committee and Professor Michael Martin, a Fordham Law School colleague of Professor Capra. Both from its style and from its content, the portion of that treatise cited in the text appears to bear the hallmarks of Professor Capra's authorship.

(id. at 701-18, quoting the Advisory Committee Note) -- instead it resulted from simple observation of a system with which Boiles was familiar based on his years of experience.

Because Boiles' observations and conclusions amount to lay testimony from a Stericycle employee, they will be accorded appropriately little weight in the class certification decision, but they cannot be completely stricken for any of the reasons advanced by plaintiffs. As with the earlier-reached Kilbourne decision, this witness qualification decision as to Boiles applies solely to the issue of class certification and does not have further implications when it comes to his ability or inability to testify at trial.

## Class Certification Standards

Amidst a troubling disagreement over basic facts such as the existence of contracts, this opinion must now sift through all of the arguments and settle on a Rule 23(c) class certification determination. Certification of a class under Rule 23(c) is appropriate only if it satisfies all four prerequisites of Rule 23(a) -- in common parlance numerosity, commonality, typicality and adequacy of representation -- and at least one of the criteria of Rule 23(b).

Here plaintiffs are seeking certification under both Rule 23(b)(2) (to the extent that they seek injunctive relief) and Rule 23(b)(3) (to the extent that they seek damages). They have the burden of showing by a preponderance of the evidence that they have met each required element of the Rule (Messner v. Northshore Univ. HealthSys., 669 F.3d 802, 811 (7th Cir. 2012)). What follows will go down the line of those Rule 23 prerequisites in order, setting out specific facts and legal standards as necessary.

**Rule 23(a)(1): Numerosity**

Under Rule 23(a)(1) a class can be certified only if "the class is so numerous that joinder of all members is impracticable." Even though Stericycle debates specific inclusions to Kilbourne's proposed class, there are clearly insufficient objections to defeat numerosity when that class contains 256,405 different customers.

**Rule 23(a)(2): Commonality**

Rule 23(a)(2) requires plaintiff to show that "there are questions of law or fact common to the class." As Wal-Mart Stores, Inc. v. Dukes, 564 U.S. 338, 349-50 (2011) (internal citation and quotation marks omitted) teaches:

> Commonality requires the plaintiff to demonstrate the class members have suffered the same injury. . . . Their claims must depend upon a common contention -- for example, the assertion of discriminatory bias on the part of the same supervisor. That common contention, moreover, must be of such a nature that it is capable of classwide resolution -- which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke.

Plaintiffs assert that all of the customers in the proposed class were injured in precisely the same way, being deceived by Stericycle into paying more than they should have contractually for medical waste services. Each class member had similar contract language forbidding arbitrary unnoticed price increases, and each was subject to the same type of API that was allegedly instituted arbitrarily without proper notice or explanation. Stericycle claims that plaintiffs err in their assertion that Stericycle uses boilerplate contract language, arguing that its contracts vary greatly, but the language in the Subparagraph 2(b) provision, which is part of the standard fine print "Terms and Conditions" of such a huge number of Stericycle contracts with class members, puts the lie to that contention. Any differences among some of its contracts to which Stericycle

points either are inconsequential or are outliers that will eliminate some individual members from the class. Any argument that those smaller customers all negotiate contracts that result in significant differences goes against the weight of the evidence.

For further evidence of commonality, the putative class consists entirely of small quantity customers, as Stericycle recognizes. Plaintiffs additionally provide evidence of unaccounted-for environmental and regulatory, fuel and energy surcharges routinely applied to class members. Stericycle's uniform way of responding to and dealing with complaints also suggests that there was a common scheme in defrauding. While Stericycle points to several differences, it ultimately does not defeat Kilbourne's conclusion that the APIs in no way lined up with the increase in Stericycle's costs.

In short, based on plaintiffs' pleadings there is enough to establish a uniform scheme by Stericycle with common addressable questions applicable to the entire class. Even if APIs do not apply equally to every class member and even if not every member has exactly the same Subparagraph 2(b) provision as Stericycle argues, there is still enough evidence of a likely common scheme to defraud. In light of all of the commonalities, there is plainly enough to establish common conduct resulting in a common injury, capable of class resolution.

**Rule 23(a)(3): Typicality**

What is known as "typicality" reflects the Rule 23(a)(3) requirement that "the claims or defenses of the representative parties [be] typical of the claims or defense of the class." As Oshana v. Coca-Cola Co., 472 F.3d 506, 514 (7th Cir. 2006) (citations and internal quotation marks and ellipsis omitted) has explained the requirement:

> A claim is typical if it arises from the same event or practice or course of conduct that gives rise to the claims of other class members and her claims are based on

> the same legal theory. Even though some factual variations may not defeat
> typicality, the requirement is meant to ensure that the named representative's
> claims have the same essential characteristics as the claims of the class at large.

Hence class representatives have been found not typical of the class when they had to rely on a legal theory different from that applicable to other class members (see, e.g., Muro v. Target Corp., 580 F.3d 485, 492-93 (7th Cir. 2009)).

In this instance all of the proposed class representatives base their claims on the same legal theory of fraudulent behavior by Stericycle in its API establishment. Plaintiffs assert that because the customers were all injured in the same way, typicality is easily achieved. That is persuasive, for the class representatives are all assertedly victims of the same APIs that allegedly violate the Subparagraph 2(b) provisions in their contracts, as well as having had to pay extra fuel and environmental surcharges (with five of the seven representatives also charged for an energy surcharge). And relatedly the same legal theories are in play as to both the representatives and the class members, with the only differences being the amount of damages (and types of surcharges).

In an effort to counter typicality, Stericycle attempts to point to several differences in how class representatives negotiated their contracts and price caps. But the exact series of events that led to different contracts and the amount at which each class member's API is capped does not play a role in the class injuries that plaintiffs allege, outside of an individualized calculation of damages. Legitimate affirmative defenses may be effective in striking class members or in lowering damages for individual class members, but they cannot be the sole grounds for defeating class certification based on a lack of typicality, as they do not go to the merits of the case (see Koos v. First Nat'l Bank of Peoria, 496 F.2d 1162, 1164 (7th Cir. 1974)).

- 13 -

**Rule 23(a)(4): Adequacy**

Rule 23(a)'s final requirement is that "the representative will fairly and adequately protect the interests of the class" (Rule 23(a)(4)). As <u>Rosario v. Livaditis</u>, 963 F.2d 1013, 1018 (7th Cir. 1992) has taught in a brief but oft-quoted formulation:

> A class is not fairly and adequately represented if class members have antagonistic or conflicting claims.

While potential but as-yet-unrealized conflicts will render a proposed class representative inadequate (see <u>Randall v. Rolls-Royce Corp.</u>, 637 F.3d 818, 824 (7th Cir. 2011)), purely speculative conflicts or mere differences in entitlement to relief will not affect a proposed representative's adequacy (<u>Johnson v. Meriter Health Servs. Employee Ret. Plan</u>, 702 F.3d 364, 372 (7th Cir. 2012)).

Because the class representatives assert precisely the same claims and seek the same relief as the class members, the representatives have common interests with the proposed class and the adequacy requirement is met. Stericycle does not point to a single conflict of interest, real or potential, that would impair the ability of any of the individual plaintiffs to represent the interests of the class fairly and adequately. Kilbourne helps to provide a conflict-free way of calculating damages, and plaintiffs' counsel, the Hagens Berman Sobol Shapiro LLP ("Hagens Berman") law firm, has more than ample experience to help represent the interests of the entire class without conflict. Individual plaintiffs are therefore adequate representatives of the class.

Thus plaintiffs have met all of the requirements of Rule 23(a). But to have their proposed class certified, they must also meet the requirements of at least one provision in Rule 23(b). And in this instance plaintiffs meet the requirements of not one but two such provisions: Rule 23(b)(2) and 23(b)(3).

**Rule 23(b)(2)**

Rule 23(b)(2) provides that a class may be certified if "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." <u>Wal-Mart</u>, 564 U.S. at 360-61 (internal citation and quotation marks omitted, emphasis in original) has explained the Rule:

> [A]t a minimum, claims for <u>individualized</u> relief . . . do not satisfy the Rule. The key to the (b)(2) class is the indivisible nature of the injunctive or declaratory remedy warranted -- the notion that the conduct is such that it can be enjoined or declared unlawful only as to all of the class members or as to none of them. In other words, Rule 23(b)(2) applies only when a single injunction or declaratory judgment would provide relief to each member of the class. It does not authorize class certification when each individual class member would be entitled to a <u>different</u> injunction or declaratory judgment against the defendant. Similarly, it does not authorize class certification when each class member would be entitled to an individualized award of monetary damages.

But that last sentence does not mean that any case involving money damages is unsuited for certification under Rule 23(b)(2). While <u>Wal-Mart</u> found individualized awards of backpay improper in a pure Rule 23(b)(2) class action, our Court of Appeals has held that injunctive relief and damages can be sought in separate phases of a single class action -- the court can simply order a "divided certification" that invokes either Rule 23(b)(2) or 23(b)(3) as to appropriate phases of the trial (<u>Johnson</u>, 702 F.3d at 371) -- which is precisely what plaintiffs seek here.

Plaintiffs look for equitable relief in the form of (1) a declaration that Stericycle's API policy was unlawful and was a breach of standard Subparagraph 2(b) pricing language, rendering such agreements voidable, as well as (2) an injunction (a) that prohibits Stericycle from continuing its unlawful pricing practices or (b) that requires it to disclose its practices accurately in future contracts. They argue that the injunctive relief class should be certified because

- 15 -

Stericycle acted on grounds that apply to the entire class, making any declaratory and injunctive relief appropriate for the class as a whole.

In that regard the API policy affected all class members, and whether it conflicted with Stericycle's standard price-change terms will apply equally to the class. Plaintiffs argue further that Stericycle's common conduct means that it can be enjoined or declared unlawful only as to all class members or as to none of them. Those arguments are legitimate, so that the injunctive relief class can be certified. Even though the plaintiffs seek individualized damages as Stericycle says, their Complaint clearly also has the goal of ensuring that Stericycle stops defrauding customers, an injunctive relief goal worthy of satisfying Rule 23(b)(2).

## Rule 23(b)(3)

Although the just-completed discussion fulfills the analytical requirements for class certification, in the interest of completeness (in the sense called for in a good many situations) this opinion turns to a comparable look at the alternative (or often complementary) terms of Rule 23(b)(3). That Rule provides that a class may be certified if "the court finds that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Courts regularly refer to those two requirements by the shorthand terms "predominance" and "superiority."

Rule 23(b)(3)'s "predominance criterion is far more demanding" than the Rule 23(a) commonality requirement (Amchem Prods., Inc. v. Windsor, 521 U.S. 591, 623-24 (1997)). While the latter requirement is met by merely showing the existence of a single question common to class members' claims, predominance requires that those common questions "can be

resolved for all members of a class in a single adjudication" (<u>Messner</u>, 669 F.3d at 815, quoting 7AA Wright & Miller, <u>Federal Practice & Procedure</u> § 1778 (3d ed. 2011) (internal punctuation marks omitted)). That means that while individual questions must not outweigh the common ones, "individual questions need not be absent" either (<u>id.</u>).

      Here common issues predominate in both the breach of contract claims and the Illinois Consumer Fraud Act claims, each of which stems from Stericycle's common practice of regularly increasing customers' prices in violation of their contracts through the use of software programming. If Stericycle is found to have violated the law when it comes to one Subparagraph 2(b) provision, it will have violated the law to varying degrees in relation to all of the provisions. Individual proof will be necessary only if Stericycle's liability is first established as to contract violations. As for their fraud claim, plaintiffs have shown a standardized pattern of misrepresentations (over and above the verifiable contract breaches), listing several legal questions that will apply to the whole class. They have also demonstrated that based on Kilbourne's testimony class members' damages can be calculated using a common, reliable formula after resolving the liability questions. Those factors provide ample evidence of a common factual link and a uniform Stericycle policy (even if that policy may not be carried out identically when it comes to each class member), so that the predominance requirement has been satisfied. Even if Kilbourne's formula were to turn out to need fine tuning or if his data were to need updating by looking at contracts manually, his research provides satisfactory evidence that damages can be calculated with a common formula applied to the entire class.

      Plaintiffs go on to argue that class treatment is superior to other available methods for adjudicating the controversy fairly and efficiently because (1) no class member has an interest in

prosecuting Stericycle individually, (2) there are no pending related cases against Stericycle on behalf of class members except those consolidated into this one and the tagalong cases referred to earlier, (3) it is expedient to concentrate the litigation before this Court (where Stericycle is located) and (4) there are no likely difficulties in managing a class action here, given the overwhelming predominance of common issues. This Court also recognizes the sheer inconvenience to the justice system (not to mention to both parties) of having to deal potentially with a quarter million different lawsuits. Thus the criterion of superiority in addition to predominance has been met as well as the other prerequisites for class certification.

**Damages Calculations**

One oft-reiterated claim from Stericycle is that Kilbourne's conclusions are incorrect and that the class should not be certified because there is insufficient data to analyze contracts over time and calculate damages. That contention is advanced despite the fact that Kilbourne used only Stericycle's data for his calculations. According to Stericycle, its database does not adequately keep track of contracts over time for customers, so that manual review of each customer file would be necessary. But no precedent suggests that poor bookkeeping should shield a company from potential liability, so that this Court rejects any argument that depends on Stericycle not adequately tracking its customer contracts. Even if that process proves to be laborious, plaintiffs must have a way to view the contracts of class members, although not every one of them may be included in Stericycle's electronic database. There was a time when computers did not exist, yet class actions did, and if Stericycle has chosen to keep poor records of its contracts digitally that is not enough to bar class certification (see Weeks v. Bareco Oil Co., 125 F.2d 84 (7th Cir. 1941)).

This Court recognizes that Kilbourne's exact calculations may be slightly off due to the asserted holes in Stericycle's system. But it would be more than troubling to deny class certification because of a lack of organization on Stericycle's end. As recognized in <u>Carrera v. Bayer Corp.</u>, 727 F.3d 300 (3d Cir. 2013), when a defendant's records are not an adequate means of finding all members of a class, the class can still be certified if the members can be identified by alternative means. It may indeed be necessary for Stericycle to provide individual contracts as to all potential class members, but that is an issue for a later date. For now there is ample reason to certify this class in light of the records that are available, and if individual contracts prove not to fit the class definition those class members can later be removed from the group.

**<u>Class Definition</u>**

Of course certifying a class is not enough -- this Court must also confirm a class definition. Plaintiffs ask that the class be defined in these terms:

> All persons and entities that, between March 8, 2003 through the date of trial resided in the United States (except Washington and Alaska), were identified by Stericycle as "Small Quantity" or "SQ" customer, and were charged and paid more than their contractually-agreed price for Stericycle's medical waste disposal goods and services pursuant to Stericycle's automated price increase policy. Governmental entities whose claims were asserted in <u>United States ex rel. Perez v. Stericycle Inc.</u> shall be excluded from the class.

This Court finds that definition adequate for the class. It encompasses all members who were subject to arbitrary price increases, which brings into play several common questions that are effective in adjudicating the action as outlined earlier. It also manages to exclude plaintiffs who have already been compensated for their injuries and also to take account of customers ineligible for class inclusion, such as those in Washington and Alaska as well as those who do not have contracts (for by definition they would not have a contractually-agreed-upon price).

Stericycle argues that the class is not ascertainable based on objective criteria. It claims that such is the case because plaintiff's definition is too vague and imprecise, impermissibly contains a "fail safe" class and is overly broad, relying on the assertedly flawed methodology of Kilbourne.

But plaintiffs' definition is perfectly precise and clear, for it outlines exactly what type of customer is included in the class. And plaintiffs have also not designated a "fail-safe" class, because the class is not defined by liability. It is defined instead by the receipt of an API and by having a provision like Subparagraph 2(b) in a contract, with it still being possible that Stericycle's profit increases are lawfully matched up with the APIs or that there is insufficient evidence of deceptive trade practices under state law. And the definition is not overbroad, for it is perfectly legitimate for classes to include some customers who have suffered no injury (Suchanek v. Sturm Foods, Inc., 764 F.3d 750, 757 (7th Cir. 2014)).

## Class Counsel

One step that must be taken in conjunction with having certified a class is to appoint class counsel officially. For all of the reasons that this Court stated in its initial decision to appoint Hagens Berman as interim class counsel in its October 11, 2013 memorandum order (and in accordance with plaintiffs' current request), it hereby appoints Hagens Berman as the official class counsel. Hagens Berman has done highly responsible work for plaintiffs up to this point, and there is no doubt that it will continue to represent the interests of the class fairly and adequately hereafter.

**<u>Conclusion</u>**

In sum, both motions to exclude witnesses (Dkt. Nos. 210 and 248) are denied, the

motion for class certification (Dkt. No. 133) is granted under both Rule 23(b)(2) and 23(b)(3),

and class counsel is appointed officially. This action is set for a status hearing at 9:30 a.m. on

February 27, 2017 to discuss further proceedings in the case.

_____
Milton I. Shadur
Senior United States District Judge

Date: February 16, 2017