UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION

| | |
|---|---|
| IN RE: STERICYCLE, INC., STERI-SAFE CONTRACT LITIGATION | No. 1:13-cv-05795<br>MDL No. 2455<br><br>Judge Milton I. Shadur |

**PLAINTIFFS' MEMORANDUM IN SUPPORT OF MOTION FOR
ATTORNEY'S FEES, COSTS, AND INCENTIVE AWARDS**

## TABLE OF CONTENTS

**Page**

I.    INTRODUCTION ..................................................................................................1

II.    AUTHORITY AND ARGUMENT ......................................................................3

    A.    The attorney's fees requested are reasonable and compare favorably with fee awards typically granted using the percentage of recovery approach. ..............3

    B.    Lead Counsel assumed significant risk in undertaking this litigation and expended considerable resources over an extended period pursuing the case. In doing so, it exhibited a high degree of dedication and skill, which resulted in an extraordinarily good settlement for the Class. If the Court employs the lodestar approach, it should apply an extraordinary multiplier and award the $40 million fee requested. ...............................................................9

    C.    Plaintiffs' expenses are reasonable and were necessary to the successful prosecution of the case. .........................................................................................12

    D.    The Class Representatives expended significant time and effort on behalf of the Class and should be granted service awards of $5,000. ............................13

    E.    The Settlement Administrator has completed the notice program required by the Preliminary Approval Order, and opposition to the Settlement is *de minimus*. ..............................................................................................................15

III.    CONCLUSION ...................................................................................................15

010362-11 1007444 V1

# TABLE OF AUTHORITIES

**Page(s)**

### CASES

*Americana Art China Co., Inc. v. Foxfire Printing & Packaging, Inc.*,
743 F.3d 243 (7th Cir. 2014) ...................................................................................9

*Aranda v. Caribbean Cruise Line, Inc.*,
2017 WL 1369741 (N.D. Ill. Apr. 10, 2017) .........................................................7

*In re AT&T Mobility Wireless Data Servs. Sales Tax Litig.*,
792 F. Supp. 2d 1028 (N.D. Ill. 2011) ......................................................12, 13, 14

*Beesley v. Int'l Paper Co.*,
2014 WL 375432 (S.D. Ill. Jan. 31, 2014) .........................................................4, 14

*Boeing Co. v. Van Gemert*,
444 U.S. 472 (1980) .................................................................................................4

*In re Brand Name Prescription Drugs Antitrust Litig.*,
2000 WL 204112 (N.D. Ill. Feb. 10, 2000) ..........................................................10

*Bridgeview Health Care Ctr., Ltd. v. Jerryclark*,
2015 WL 4498741 (N.D. Ill. July 23, 2015) ...........................................................4

*In re Capital One Tel. Consumer Prot. Act Litig.*,
80 F. Supp. 3d 781 (N.D. Ill. 2015) ...............................................................5, 7, 8

*In re Cenco, Inc. Sec. Litig.*,
519 F. Supp. 322 (N.D. Ill. 1981) .........................................................................10

*In re Cont'l Ill. Sec. Litig.*,
962 F.2d 566 (7th Cir. 1992) ........................................................................4, 6, 10

*Cook v. Niedert*,
142 F.3d 1004 (7th Cir. 1998) ....................................................................10, 13, 14

*Craftwood Lumber Co. v. Interline Brands, Inc.*,
2015 WL 1399367 (N.D. Ill. Mar. 23, 2015) ..........................................................7

*Florin v. Nationsbank of Ga., N.A.*,
34 F.3d 560 (7th Cir. 1994) .....................................................................................3

*Gaskill v. Gordon*,
160 F.3d 361 (7th Cir. 1998) ...................................................................................4

*Gastineau v. Wright*,
592 F.3d 747 (7th Cir. 2010) ...............................................................................9, 10

*Gehrich v. Chase Bank USA, N.A.*,
316 F.R.D. 215 (2016) ...........................................................................................7, 13

*Harman v. Lyphomed, Inc.*,
945 F.2d 969 (7th Cir. 1991) ..........................................................................10

*Hensley v. Eckerhart*,
461 U.S. 424 (1983)...........................................................................................10

*Kolinek v. Walgreen Co.*,
311 F.R.D. 483 (N.D. Ill. 2015)......................................................................14

*Montgomery v. Aetna Plywood, Inc.*,
231 F.3d 399 (7th Cir. 2000) ...........................................................................4

*Redman v. RadioShack Corp.*,
768 F.3d 622 (7th Cir. 2014) ...........................................................................4

*Silverman v. Motorola Sols., Inc.*,
739 F.3d 956 (7th Cir. 2013) ........................................................................3, 6

*Sutton v. Bernard*,
504 F.3d 688 (7th Cir. 2007) ...........................................................................3

*In re Synthroid Mktg. Litig.*,
264 F.3d 712 (7th Cir. 2001) ...........................................................................5

*In re Synthroid Mktg. Litig.*,
325 F.3d 974 (7th Cir. 2003)......................................................................6, 7, 9

*Taubenfeld v. Aon Corp.*,
415 F.3d 597 (7th Cir. 2005) ...........................................................................4

*Williams v. Rohm & Haas Pension Plan*,
658 F.3d 629 (7th Cir. 2011) ...........................................................................9

## OTHER AUTHORITIES

Brian T. Fitzpatrick, *An Empirical Study of Class Action Settlements and Their
Fee Awards*, 7 J. EMPIRICAL LEGAL STUDIES 811 (2010)......................................8

Fed. R. Civ. P. 23(h) ........................................................................................12

Theodore Eisenberg & Geoffrey P. Miller, *Attorney Fees in Class Action
Settlements: 1993-2008*, 7 J. EMPIRICAL LEGAL STUDIES 248 (2010) .......................8

## I.    INTRODUCTION

Hagens Berman Sobol Shapiro LLP ("Lead Counsel") respectfully submits this memorandum in support of Plaintiffs' motion seeking an award of attorney's fees and expenses and service awards for the Class Representatives. Pursuant to the Court's October 26, 2017 Preliminary Approval Order, this motion comes in advance of the January 22, 2018 deadline for class members to opt-out or object to the Settlement. The deadline for Lead Counsel to submit its Motion for Final Approval and respond to any objections is February 12, 2018.[1] The Fairness Hearing is February 23, 2018.

Lead Counsel requests $40 million in attorney's fees and the reimbursement of $2,670,604.35 in reasonable and necessary costs.[2] The requested fees constitute just 8.79% of the total value of relief to the Class[3] and 13.56% of the cash portion of the Settlement, percentages far lower than awards commonly approved in similar class actions. Lead Counsel's <u>costs</u> amount to only 0.6% of the total value, or 0.9% of the cash portion of the Settlement, which also compares favorably to similar cases and speaks to Lead Counsel's efficiency and economy. Finally, Plaintiffs seek $5,000 service awards for each Class Representative—an amount routinely granted in successful class actions.

---

[1] Lead Counsel will submit a proposed order regarding this motion with its motion for final approval. Both motions are noted for consideration on February 23, 2018.

[2] The Settlement Agreement, attached to the Declaration of Steve W. Berman ("Berman Decl."), filed concurrently herewith, as Exhibit 1 ("Agreement"), permits a request of fees up to $40 million and costs up to $2.8 million. Agreement at p. 21.

[3] The Settlement requires Stericycle to discontinue its disputed API pricing practice and cap future price increases, which it has already done. Those pricing caps, when compared to the *status quo* of 18% price increases twice annually, have a real and calculable value to the Class, which Lead Counsel estimates to be $160 million.

010362-11 1007444 V1

The Settlement provides $295 million in cash, roughly 32% of total Class damages.[4] (Stericycle would present evidence that the recovery exceeds actual damages.) The cash portion of the Settlement alone, considering the risks of litigation, the effort and skill demonstrated in achieving this result, the highly contested and risky nature of the case, and the efficiency of Lead Counsel's efforts, is sufficient to justify the costs, fees, and awards requested.

But the cash component is not the only aspect of the Settlement that provides quantifiable value to the Class. The Agreement requires Stericycle to cease the disputed practice of imposing 18% price increases twice annually and caps price increases for customers subject to the old API policy at 6% annually.[5] In response to Lead Counsel's efforts in this litigation, Stericycle began transitioning customers away from its API policy in 2015 and, as required by the Agreement, ceased its API practice for existing customers following preliminary approval.[6] The realized and future savings to the Class from the termination of the API practice at issue amount to $160 million.[7] So while the cash payment to the Class is $295 million, the true value of the Settlement is at least $455 million.

The Settlement also provides benefits that are not easily quantifiable, but are still valuable. Following final approval, all new contracts for Small Quantity ("SQ") customers will have annual price increases capped at 8% and must comport with new disclosure requirements

---

[4] Agreement at p. 11. *See also* Declaration of Patrick J. Kilbourne ("Kilbourne Decl."), filed concurrently herewith, ¶ 9.

[5] The Agreement required Stericycle to cease this practice within 60 days after entry of preliminary approval, which it has done. Berman Decl. ¶ 20.

[6] Kilbourne Decl. ¶ 4. *See also* Berman Decl. ¶¶ 20-22.

[7] Kilbourne Decl. ¶¶ 5-7. *See also* Berman Decl. ¶ 22. Of the $160 million, $7 million was realized between January 2015 and December 2017, while the remaining $153 million will be realized between January 2018 and December 2020. *Id.* Although some customers may still benefit from the API cap after that time, we have conservatively assumed that most customers will have either aged out of their current contracts or entered into new contracts by that time.

that will increase transparency.[8] To ensure these benefits accrue to the Class as agreed, Retired

Federal Judge Wayne Andersen and Lead Counsel will monitor Stericycle's compliance for a

period of three years.[9] The Settlement not only procures significant cash payments for the Class,

but also ensures fair treatment going forward and implements a mechanism to guarantee that

there is substance, and not merely hopeful thinking, behind the prospective relief.

   The Settlement is an extraordinarily good result for the Class. At the outset, Plaintiffs

had two main goals: (1) obtain compensation for the alleged overcharges and (2) stop

Stericycle's disputed pricing practice. Through Lead Counsel's efforts, the Settlement met both

goals: it provides $295 million in cash, an additional $160 million in relief from price increases,

and requires Stericycle to cease the disputed practice. In light of that extraordinary result, Lead

Counsel's request for fees of 8.9% of the value to the Class is modest compared to awards in

similar cases. Likewise, the reasonable costs and service awards should be granted.

## II. AUTHORITY AND ARGUMENT

A. **The attorney's fees requested are reasonable and compare favorably with fee awards typically granted using the percentage of recovery approach.**

   In the Seventh Circuit, "in common fund cases, the decision whether to use a percentage

method or a lodestar method remains in the discretion of the district court."[10] But Lead Counsel

fee awards seek to reflect "the market price for legal services, in light of the risk of nonpayment

and the normal rate of compensation in the market at the time."[11] In this case, the percentage

---

   [8] Agreement at pp. 16-17. The 8% increase cap on future contracts also has real value and represents real money savings for class members. But because these contracts will begin at an unknown future date, the savings to the Class is not included in the $160 million estimated value of stopping the API practice for existing contracts.

   [9] *See* Agreement at pp. 17-20.

   [10] *Florin v. Nationsbank of Ga., N.A.*, 34 F.3d 560, 566 (7th Cir. 1994).

   [11] *Sutton v. Bernard*, 504 F.3d 688, 692 (7th Cir. 2007) (internal quotation marks and citation omitted). *See also Silverman v. Motorola Sols., Inc.*, 739 F.3d 956, 957 (7th Cir. 2013)

method is most appropriate for analyzing the reasonableness of the fee request and most accurately approximates the fee that Lead Counsel would obtain in the open market.

Under the "common fund" doctrine, "a litigant or a lawyer who recovers a common fund for the benefit of persons other than himself or his client is entitled to a reasonable attorney's fee from the fund as a whole."[12]  "The doctrine rests on the perception that persons who obtain the benefit of a lawsuit without contributing to its cost are unjustly enriched at the successful litigant's expense. Jurisdiction over the fund involved in the litigation allows a court to prevent this inequity by assessing attorney's fees against the entire fund, thus spreading fees proportionately among those benefited by the suit."[13]  "When a class suit produces a fund for the class, it is commonplace to award the lawyers for the class a percentage of the fund."[14]

Counsel is "entitled to the fee they would have received had they handled a similar suit on a contingent fee basis, with a similar outcome, for a paying client,"[15] and a 30% fee award is not unusual in common fund cases.[16] Importantly, the court must consider the overall benefit to the class, including non-monetary benefits, when evaluating a fee request.[17]

---

("[A]ttorneys' fees in class actions should approximate the market rate that prevails between willing buyers and willing sellers of legal services.").

[12] *Boeing Co. v. Van Gemert*, 444 U.S. 472, 478 (1980).

[13] *Id.* (internal citations omitted).

[14] *Gaskill v. Gordon*, 160 F.3d 361, 362 (7th Cir. 1998) (citations omitted).

[15] *In re Cont'l Ill. Sec. Litig.*, 962 F.2d 566, 572 (7th Cir. 1992). *See also Montgomery v. Aetna Plywood, Inc.*, 231 F.3d 399, 408 (7th Cir. 2000) ("[W]hat is reasonable is what an attorney would receive from a paying client in a similar case.") (citations omitted).

[16] *See Taubenfeld v. Aon Corp.*, 415 F.3d 597, 598-600 (7th Cir. 2005) (approving a fee award of 30% of a $7.25 million settlement fund); *In re Cont'l Ill. Sec. Litig.*, 962 F.2d at 572 (in class actions, "the usual range for contingent fees is between 33 and 50 percent"); *Bridgeview Health Care Ctr., Ltd. v. Jerryclark*, 2015 WL 4498741, at *2 (N.D. Ill. July 23, 2015) (awarding 1/3 of common fund in TCPA class action).

[17] *See, e.g., Redman v. RadioShack Corp.*, 768 F.3d 622, 635 (7th Cir. 2014). *See also Beesley v. Int'l Paper Co.*, 2014 WL 375432, at *1 (S.D. Ill. Jan. 31, 2014).

The Seventh Circuit offers three guidelines to assist courts in estimating the market rate: (1) the fee contract between plaintiffs and counsel, (2) data from similar cases, and (3) information from class-counsel auctions.[18] Courts must also consider the risk that Lead Counsel assumed by undertaking the representation because risk is necessarily a factor in determining the price counsel would have charged in arm's-length *ex ante* negotiations.[19]

Here, the first and third factors are not particularly helpful. In consumer cases, courts commonly find that named plaintiff retainer agreements are not indicative of market price because they "do not inform the court's estimation sufficiently as to what Lead Counsel would have received in an *ex ante* negotiation with the entire class, ha[d] such a negotiation occurred."[20] Information from counsel auctions also offers little guidance, given that no such auction occurred, nor is there a sufficient pool of information regarding auctions in cases like this one, involving contract and consumer protection issues as well as requiring complex and expensive data analysis. But to the extent it is relevant, this factor favors Lead Counsel's request. There is no basis to assume that in an auction at the outset of the litigation—before the extent of damages was known, and before the framework for potential liability had been established through discovery—any firm would have proposed a fee percentage below 8.79% of the total recovery, or even 13.56% of the cash recovery. Given the size, complexity, expense, and risk of the case, it is unlikely that any firm would make such an offer.

So the analysis here, as with most class actions, turns on a comparison of the fees requested in this case to the fees awarded in similar cases. That comparison shows that by any

---

[18] *In re Synthroid Mktg. Litig.*, 264 F.3d 712, 719 (7th Cir. 2001).

[19] *Id.*

[20] *In re Capital One Tel. Consumer Prot. Act Litig.*, 80 F. Supp. 3d 781, 796 (N.D. Ill. 2015).

010362-11 1007444 V1

metric, benchmark, or methodology, Lead Counsel's fee request of 8.79% of the total recovery is far less than the percentages commonly approved in similar cases.

The modern trend in "megafund" cases has been to award fees on a tiered basis, with decreasing percentages awarded as the recovery increases. Although fee percentages tend to decline as the size of the settlement increases,[21] the Seventh Circuit has rejected an outright cap on attorney's fees in megafund cases. In *Silverman*, for example, the court held that "an award fixed at 27.5% of a $200 million fund is exceptionally high" but "[i]t does not necessarily follow that 27.5% is legally excessive."[22] Even facing such an unusually high award, the court concluded that, given the risk of the litigation and the high costs absorbed by counsel, "the district judge did not abuse her discretion in concluding that the risks of [the] suit justified a substantial award, even though compensation in most other suits has been lower."[23]

The *Silverman* court advocated the "sliding-scale approach" to determining fee awards, reasoning that "[a]warding counsel a decreasing percentage of the higher tiers of recovery enables them to recover the principal costs of litigation from the first bands of the award, while allowing the clients to reap more of the benefit at the margin."[24] This approach has yielded tiered fee awards in several other Seventh Circuit large settlement cases.[25] For example, in *Synthroid II*, counsel was awarded 30% of the first $10 million, 25% of the next $10 million, 22% of the band

---

[21] *Silverman*, 739 F.3d at 958.

[22] *Id.*

[23] *Id.*

[24] *Id.* at 959.

[25] *In re Cont'l Ill. Sec. Litig.*, 962 F.2d at 572 ("In large commercial litigation with prospects of multimillion dollar recoveries the percentage frequently is tapered—it might be 33 percent of the first million, 25 percent of the next million, and so on down," but it should not involve a recovery cap or other disincentive.).

from $20 to $46 million, and 15% of the remainder.[26] This tiered structure resulted in an overall award of 19.9% of the $88 million settlement fund ($17.52 million). *Synthroid II* effectively established 30% as the benchmark for the first band of recovery in sliding scale arrangements and 20% as the benchmark for the total fee award. Courts within the circuit have applied these benchmarks to other large settlements.[27]

The $40 million fee award sought by Lead Counsel here, constituting just 8.79% of the total class recovery and 13.56% of the cash payment, is well below the 20% informal benchmark set in *Synthroid II*. In fact, Lead Counsel's request falls below even the lowest percentage (15%) frequently awarded to the *highest* tier of recovery using the sliding scale approach. Because a sliding scale similar to that used in other cases would result in a higher recovery than is sought here, it is unnecessary.[28]

Empirical studies of fee awards in class actions also support the reasonableness of the fee sought here. There are two leading studies addressing the fees awarded in federal class action

---

[26] *In re Synthroid Mktg. Litig.*, 325 F.3d 974 (7th Cir. 2003) ("*Synthroid II*").

[27] *See Gehrich v. Chase Bank USA, N.A.*, 316 F.R.D. 215, 237 (2016) (awarding 30% of the first $10 million, 25% of the second $10 million, and 20% of the remaining amounts from $20 to $28.79 million—resulting in an overall fee award of 21.35% of the $34 million common fund); *In re Capital One Tel. Consumer Prot. Act Litig.*, 80 F. Supp. 3d at 805 (applying the same 30%-25%-20% sliding scale, but adding a 6% "risk premium" to the first $10 million, resulting in an overall fee award of 20.77% of the $75 million settlement fund); *Craftwood Lumber Co. v. Interline Brands, Inc.*, 2015 WL 1399367, at *5 (N.D. Ill. Mar. 23, 2015) (awarding 30% of the first $10 million, 25% of the second $10 million, and 20% of the remainder—resulting in an overall fee award of 23.75% of the $40 million common fund); *Aranda v. Caribbean Cruise Line, Inc.*, 2017 WL 1369741, at *5 (N.D. Ill. Apr. 10, 2017) ("[T]he sliding-scale approach . . . appears to have become the standard model in this circuit for cases [involving large settlements].").

[28] For illustrative purposes, the sliding scale employed in *Synthroid II* (30% of the first $10 million, 25% of the next $10 million, 22% of the band between $20 and $46 million, and 15% of the remainder) would yield a fee of $72,570,000 based on total recovery, or $48,570,000 based on the cash component only.

cases: Theodore Eisenberg & Geoffrey P. Miller, *Attorney Fees in Class Action Settlements: 1993-2008*, 7 J. EMPIRICAL LEGAL STUDIES 248 (2010), and Brian T. Fitzpatrick, *An Empirical Study of Class Action Settlements and Their Fee Awards*, 7 J. EMPIRICAL LEGAL STUDIES 811 (2010).[29] The Eisenberg study divided cases between 2009 and 2013 into ten tiers based on settlement value and found that the largest cases (with recoveries over $100 million) resulted in an average fee percentage of 22.3%.[30] The Fitzpatrick study, examining "every federal class action settlement from the years 2006 and 2007," found that the mean and median attorney fee percentages awarded in class action settlements between $250 and $500 million during that time were 17.8% and 19.5%, respectively, with a standard deviation of 7.9%.[31]

These figures are significant not only because they demonstrate that Lead Counsel's fee request is lower than average, but also because the averages reflect the collective wisdom of many courts over many years determining what the market rate is for contingent fee work in class cases. And the clear trend is for awards in megafund cases near the 20% mark. Lead Counsel's request for a fee award of 8.79% of the total recovery or 13.56% of the cash component is well under market price, and is the best indicator of what Lead Counsel would have received from a paying client—and one driving a hard bargain, at that.

---

[29] The court in *Capital One* cited and relied upon both of these studies. *See In re Capital One Tel. Consumer Prot. Act Litig.*, 80 F. Supp. 3d at 797-98.

[30] Berman Decl., Ex. 4 (Eisenberg Study), at p. 9.

[31] Berman Decl., Ex. 5 (Fitzpatrick Study), at pp. 812, 839.

**B.     Lead Counsel assumed significant risk in undertaking this litigation and expended considerable resources over an extended period pursuing the case. In doing so, it exhibited a high degree of dedication and skill, which resulted in an extraordinarily good settlement for the Class. If the Court employs the lodestar approach, it should apply an extraordinary multiplier and award the $40 million fee requested.**

If applying the percentage approach, a district court is not obligated to cross-check requested fees against the lodestar.[32] In fact, the use of a lodestar cross-check is no longer recommended in the Seventh Circuit.[33] But a district court should not place undue focus on the calculus of the fee recovery, and instead should choose the method that most equitably compensates Lead Counsel for the results achieved and the risks undertaken—be that the percentage method or the lodestar method.[34] As discussed above, Lead Counsel believes that the percentage method is the more appropriate method for calculating the fee award in this case. However, even if the lodestar method is used, the extraordinary result justifies the award sought.

Under the lodestar method, the court calculates a base lodestar by multiplying a reasonable hourly rate by the number of hours reasonably expended.[35] It may then adjust the base lodestar using the following factors: (1) the time and labor required; (2) the novelty and difficulty of the questions; (3) the skill required to perform the legal service properly; (4) the preclusion of employment by the attorney due to acceptance of the case; (5) the customary fee; (6) whether the fee is fixed or contingent; (7) time limitations imposed by the client or the circumstances; (8) the amount involved and the results obtained; (9) the experience, reputation,

---

[32] *Williams v. Rohm & Haas Pension Plan*, 658 F.3d 629, 636 (7th Cir. 2011).

[33] *See Synthroid II*, 325 F.3d at 979-80 ("The client cares about the outcome alone" and Lead Counsel's efficiency should not be used "to reduce Lead Counsel's percentage of the fund that their work produced.").

[34] *Americana Art China Co., Inc. v. Foxfire Printing & Packaging, Inc.*, 743 F.3d 243 (7th Cir. 2014).

[35] *Gastineau v. Wright*, 592 F.3d 747, 748 (7th Cir. 2010).

and ability of the attorneys; (10) the "undesirability" of the case; (11) the nature and length of the professional relationship with the client; and (12) awards in similar cases.[36]

District courts are required to award a multiplier when fees are contingent upon the outcome of the case.[37] To determine the appropriate multiplier, the court must attempt "a retroactive calculation of the probability of success as measured at the beginning of litigation."[38] The Seventh Circuit typically has awarded multipliers anywhere between one and four.[39]

Work performed under the direction of Lead Counsel on the litigation exceeds 19,783 hours to date, for a <u>total lodestar value of $9,984,303.50</u> at current and reasonable hourly rates.[40] The resulting lodestar multiplier for the $40 million fee award sought would be 4.01, which, on the high end of what is typically allowed, is warranted in this case.

This litigation required tremendous time and energy by counsel, with nearly 20,000 hours expended over nearly five years of litigation, with multiple attorneys working nearly full time on the case for much of that time. The case involved difficult and complicated issues centered on the analysis of Stericycle's enormous customer database containing millions of entries for over 280,000 class members. The ability to certify this case as a class action—and ultimately establish

---

[36] *Id.*; *see also Hensley v. Eckerhart*, 461 U.S. 424, 444 n.3 (1983).

[37] *Cook v. Niedert*, 142 F.3d 1004 (7th Cir. 1998); *see also In re Cont'l Ill. Sec. Litig.*, 962 F.2d at 569.

[38] *Cook*, 142 F.3d at 1013 (internal quotation marks and citation omitted).

[39] *Harman v. Lyphomed, Inc.*, 945 F.2d 969, 976 (7th Cir. 1991); *see also In re Cenco, Inc. Sec. Litig.*, 519 F. Supp. 322, 327 (N.D. Ill. 1981) (applying a lodestar multiplier of four to lead counsel's lodestar and two to other counsels' lodestar); *In re Brand Name Prescription Drugs Antitrust Litig.*, 2000 WL 204112, at *3 (N.D. Ill. Feb. 10, 2000) (awarding $91 million above lodestar and noting that "[a]n award of more than two times the lodestar calculation is believed to be fair and just in these circumstances").

[40] Berman Decl., ¶¶ 31-35 and Ex. 3. Stericycle is required to report to the Settlement Monitor and Lead Counsel for a period of three years following the Final Effective Date. In monitoring Stericycle's compliance, Lead Counsel will necessarily spend additional attorney time and accumulate additional lodestar.

-10-

Stericycle's liability—turned on Lead Counsel's ability to work effectively with its expert to locate, identify, and analyze the data in a manner allowing common proof of Stericycle's pricing practices and damages to the Class. Lead Counsel's creative approach to this problem helped gain class certification and allowed for a settlement that will allow checks in the appropriate amounts to be mailed directly to class members, with no further action needed on their part. And this Court has previously acknowledged the reputation, skill, and ability of Lead Counsel, resulting in a total recovery of over $455 million and leading to important changes in the way Stericycle does business.[41]

Because this was a contingent fee case, Lead Counsel undertook the work, expended thousands of hours, and incurred over $2.6 million in expenses with no guarantee of any compensation. The case was by no means a sure win. Stericycle fiercely disputed the allegations and presented defenses that could have (and still can, if the Agreement does not gain final approval) defeated liability or severely reduced the size of the recovery or class. And although Lead Counsel expended significant time and resources on the case, it achieved the positive result efficiently, both in terms of lodestar and costs incurred. The Court should reward, not penalize Lead Counsel for that efficiency. Finally, as discussed above, awards in similar class actions, many with arguably inferior results, typically approach 20% of the total recovery.

In light of these factors, a lodestar multiplier of 4.01, resulting in a fee of just 8.79% of the total recovery, is justified. This was not a slam-dunk case that settled quickly, with little effort. It was a hard-fought, highly contested battle requiring five years of dedicated work, the expenditure of millions of dollars, and significant skill and the ability to bring it to a successful

---

[41] Brief biographies of Lead Counsel's qualifications, and those of the attorneys who worked on this case, may be found at Berman Decl., ¶¶ 23-28 and Ex. 2. Information relating to co-counsel working under Lead Counsel's direction may be found at Berman Decl., Ex. 3 and the exhibits thereto.

resolution. Despite these challenges, Lead Counsel obtained a result that may fairly be described as a home run for the Class: a Settlement that not only provides $455 million in cash and savings to the Class, but that also incorporates the injunctive relief sought in the Complaint and ends the disputed pricing practice. If the Court employs the lodestar, it should use a lodestar multiplier of 4.01 and award the $40 million in fees requested.

## C. Plaintiffs' expenses are reasonable and were necessary to the successful prosecution of the case.

Rule 23 allows the Court to "award reasonable attorney's fees and nontaxable costs that are authorized by law or by the parties' agreement." Fed. R. Civ. P. 23(h). Lead Counsel (and co-counsel) expended $2,670,604.35 in litigating this case.[42] An accounting of these costs consistent with the way such costs are accounted for with paying clients is included with this motion.[43]

In light of the recovery of $455 million (or $295 million counting only the cash portion), the amount of those costs is reasonable. In *In re AT&T Mobility Wireless Data Services Sales Tax Litigation*,[44] the court observed "a 2004 empirical study, which found that costs and expenses for the sample as a whole were, on average 4 percent of the relief for the class." The costs here amount to only 0.6% of the total Settlement value, or 0.9% of the cash portion.

Individually, the costs incurred were reasonable and necessary. The vast majority of those costs were for expert services, which account for roughly 91.7% of the total. The expert work was critical to the successful outcome. This case involved enormous amounts of data that

---

[42] Stericycle is required to report to the Settlement Monitor and Lead Counsel for a period of three years following the Final Effective Date. In monitoring Stericycle's compliance, Lead Counsel will certainly continue to incur costs and expenses.

[43] *See* Berman Decl., ¶¶ 32, 36, and Ex. 3.

[44] 792 F. Supp. 2d 1028, 1041 (N.D. Ill. 2011), quoting Theodore Eisenberg & Geoffrey P. Miller, *Attorney Fees in Class Action Settlements: An Empirical Study*, 1 J. EMPIRICAL LEGAL STUD. 27, 70 (2004) (internal quotation marks and alterations omitted).

required expert analysis. Lead Counsel invested in that analysis, which was not only critical to class certification, but also would have been key to establishing Stericycle's liability at trial. The expert work also benefitted the Class by allowing for a streamlined distribution process, eliminating the need for a claims process and allowing the direct mailing of each class member's correct share of the Settlement. The other costs were reasonable and customary, and such costs are incurred in every case with national scale. They include filing fees, copying and research expenses, deposition and court reporting expenses, document hosting expenses for the roughly one million documents produced in this case, and modest travel expenses. Lead Counsel advanced these necessary expenses, interest-free, without any assurance that they would ever be recouped. The costs claimed are reasonable and should be allowed.

**D.     The Class Representatives expended significant time and effort on behalf of the Class and should be granted service awards of $5,000.**

Courts routinely grant service awards to Class Representatives to encourage plaintiffs to serve and to reward the representatives' efforts for the benefit of the class. The modest $5,000 service award requested—an amount commonly permitted even in cases requiring less effort by representatives than did this one[45]—is reasonable and should be granted.

"Because a named plaintiff is an essential ingredient of any class action, an incentive award is appropriate if it is necessary to induce an individual to participate in the suit."[46] "In deciding whether such an award is warranted, relevant factors include the actions the plaintiff has taken to protect the interests of the class, the degree to which the class has benefitted from

---

[45] *See, e.g.*, *Gehrich*, 316 F.R.D. at 239 ("Courts in this District have recently and routinely granted $5,000 incentive awards to named plaintiffs in TCPA cases.").

[46] *Cook*, 142 F.3d at 1016 (approving $25,000 incentive award in employment case yielding roughly $14.4 million for the class). *See also In re AT&T Mobility Wireless Data Servs. Sales Tax Litig.*, 792 F. Supp. 2d at 1041 ("Incentive payments sufficient to induce a named plaintiff to participate in the lawsuit are appropriate within the Seventh Circuit.").

those actions, and the amount of time and effort the plaintiff expended in pursuing the litigation."[47] "It is also worth noting that courts regularly approve $5,000 incentive awards in common fund cases like this one."[48]

The Class Representatives expended significant effort on behalf of the class over nearly five years, and their efforts helped bring about the significant benefits embodied in the Settlement Agreement. Each Class Representative properly attended to its duty to remain informed about the lawsuit, worked with counsel to respond to interrogatories and produce documents, prepared for and (with one exception) attended a deposition by Stericycle's counsel, and gave due consideration to whether the Settlement was in the best interests of the Class.[49] The Class Representatives estimate that they spent between 20 and 40 hours attending to their responsibilities.[50] The total incentive awards requested for the seven Class Representatives amount to $35,000, which is just over 1/100th of a percent of the total cash recovery, far less than commonly approved. "[T]otal Named Plaintiff awards of less than one percent of the fund are well within the ranges that are typically awarded in comparable cases."[51]

---

[47] *Cook*, 142 F.3d at 1016.

[48] *Kolinek v. Walgreen Co.*, 311 F.R.D. 483, 503 (N.D. Ill. 2015) (approving $5,000 incentive award in TCPA case even though the "case did not proceed past the earliest phases of formal discovery before it was settled"). *See also In re AT&T Mobility Wireless Data Servs. Sales Tax Litig.*, 792 F. Supp. 2d at 1041 (approving $5,000 incentive awards even though the representatives were never deposed or required to respond to discovery).

[49] *See* declarations of Class Representatives, filed concurrently herewith. The one exception was ResearchDx, whose deposition was scheduled but then canceled at the last moment to allow the parties to enter into settlement negotiations. Dr. Philip Cotter, ResearchDx's owner and president, had already prepared for and was ready for his deposition to proceed, but Stericycle chose not to reschedule the deposition after litigation recommenced.

[50] *Id.*

[51] *Beesley*, 2014 WL 375432, at *4 (citing examples).

The Class Representatives—like most class members—are small businesses such as veterinarians, physicians, and medical laboratories. The time spent on this litigation was time away from their core businesses, making the service awards an important incentive to encourage participation. Given the substantial benefits accruing to the Class and the need to encourage participation by small businesses in cases like this, $5,000 service awards are appropriate.

**E.     The Settlement Administrator has completed the notice program required by the Preliminary Approval Order, and opposition to the Settlement is *de minimus*.**

As required by the Preliminary Approval Order, the Settlement Administrator's declaration regarding the notice program to class members is submitted with this motion.[52] As detailed in that report, 283,043 notices have been mailed, with a successful mailing rate (including re-mailings after further research for notices returned as undeliverable) of approximately 90%.[53] The Settlement Administrator also established the Settlement website (2,868 visits to date), telephone line (499 calls to date), and has mailed 18 long-form notices upon request. Despite this successful and widespread notice campaign, and recognizing that time remains for class members to opt out or object, the Settlement Administrator has received only nine opt-out requests, and no objections to the Settlement.[54]

### III.     CONCLUSION

For all the above-stated reasons, Lead Counsel respectfully requests that the Motion be granted and the Court enter an order: (i) granting Lead Counsel $40,000,000 in attorney's fees; (ii) granting Lead Counsel $2,670,604.35 in costs; and (iii) granting each Class Representative a Service Award of $5,000.00.

---

[52] *See* Declaration of Shandarese Garr, filed concurrently herewith.

[53] Not surprisingly, given the length of time covered by the Settlement, some class member businesses have either closed their doors or otherwise have not been located.

[54] *Id.*

DATED: January 5, 2018                    Respectfully submitted,

                                          By: */s/ Steve W. Berman*
                                              Steve W. Berman
                                          Garth D. Wojtanowicz
                                          HAGENS BERMAN SOBOL SHAPIRO LLP
                                          1918 Eighth Avenue, Suite 3300
                                          Seattle, WA 98101
                                          Telephone: (206) 623-7292
                                          Facsimile: (206) 623-0594
                                          Email: steve@hbsslaw.com
                                          Email: garthw@hbsslaw.com

                                          Elizabeth A. Fegan
                                          HAGENS BERMAN SOBOL SHAPIRO LLP
                                          455 Cityfront Plaza Drive, Suite 2410
                                          Chicago, IL 60611
                                          Telephone: (708) 628-4949
                                          Facsimile: (708) 628-4950
                                          Email: beth@hbsslaw.com

                                          *Lead Counsel*

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a true and accurate copy of the foregoing was filed electronically via the Court's ECF system on January 5, 2018. Notice of electronic filing will be sent to all parties by operation of the Court's electronic filing system.

DATED: January 5, 2018           HAGENS BERMAN SOBOL SHAPIRO LLP

By: */s/ Steve W. Berman*
  STEVE W. BERMAN

010362-11 1007444 V1